UNITED STATES *v.* KNOTTS

No. 81–1802.   Argued December 6 1982—Decided March 2, 1983

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and O'CONNOR, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in which MARSHALL, J., joined, *post*, p. 285. BLACKMUN, J., filed an opinion concurring in the judgment, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 287. STEVENS, J., filed an opinion concurring in the judgment, in which BRENNAN, and MARSHALL, JJ., joined, *post*, p. 288.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen, Elliott Schulder,* and *Gloria C. Phares.*

*Mark W. Peterson* argued the cause and filed a brief for respondent.

JUSTICE REHNQUIST delivered the opinion of the Court.

A beeper is a radio transmitter, usually battery operated, which emits periodic signals that can be picked up by a radio receiver. In this case, a beeper was placed in a five-gallon drum containing chloroform purchased by one of respondent's codefendants. By monitoring the progress of a car carrying the chloroform Minnesota law enforcement agents were able to trace the can of chloroform from its place of purchase in Minneapolis, Minn., to respondent's secluded cabin near Shell Lake, Wis. The issue presented by the case is whether such use of a beeper violated respondent's rights secured by the Fourth Amendment to the United States Constitution.

I

Respondent and two codefendants were charged in the United States District Court for the District of Minnesota with conspiracy to manufacture controlled substances, including but not limited to methamphetamine, in violation of 21 U. S. C. § 846. One of the codefendants, Darryl Petschen,

was tried jointly with respondent; the other codefendant, Tristan Armstrong, pleaded guilty and testified for the Government at trial.

Suspicion attached to this trio when the 3M Co., which manufactures chemicals in St. Paul, notified a narcotics investigator for the Minnesota Bureau of Criminal Apprehension that Armstrong, a former 3M employee, had been stealing chemicals which could be used in manufacturing illicit drugs. Visual surveillance of Armstrong revealed that after leaving the employ of 3M Co., he had been purchasing similar chemicals from the Hawkins Chemical Co. in Minneapolis. The Minnesota narcotics officers observed that after Armstrong had made a purchase, he would deliver the chemicals to codefendant Petschen.

With the consent of the Hawkins Chemical Co., officers installed a beeper inside a five-gallon container of chloroform, one of the so-called "precursor" chemicals used to manufacture illicit drugs. Hawkins agreed that when Armstrong next purchased chloroform, the chloroform would be placed in this particular container. When Armstrong made the purchase, officers followed the car in which the chloroform had been placed, maintaining contact by using both visual surveillance and a monitor which received the signals sent from the beeper.

Armstrong proceeded to Petschen's house, where the container was transferred to Petschen's automobile. Officers then followed that vehicle eastward towards the state line, across the St. Croix River, and into Wisconsin. During the latter part of this journey, Petschen began making evasive maneuvers, and the pursuing agents ended their visual surveillance. At about the same time officers lost the signal from the beeper, but with the assistance of a monitoring device located in a helicopter the approximate location of the signal was picked up again about one hour later. The signal now was stationary and the location identified was a cabin occupied by respondent near Shell Lake, Wis. The record before us does not reveal that the beeper was used after the

location in the area of the cabin had been initially determined.

Relying on the location of the chloroform derived through the use of the beeper and additional information obtained during three days of intermittent visual surveillance of respondent's cabin, officers secured a search warrant. During execution of the warrant, officers discovered a fully operable, clandestine drug laboratory in the cabin. In the laboratory area officers found formulas for amphetamine and methamphetamine, over $10,000 worth of laboratory equipment, and chemicals in quantities sufficient to produce 14 pounds of pure amphetamine. Under a barrel outside the cabin, officers located the five-gallon container of chloroform.

After his motion to suppress evidence based on the warrantless monitoring of the beeper was denied, respondent was convicted for conspiring to manufacture controlled substances in violation of 21 U. S. C. § 846. He was sentenced to five years' imprisonment. A divided panel of the United States Court of Appeals for the Eighth Circuit reversed the conviction, finding that the monitoring of the beeper was prohibited by the Fourth Amendment because its use had violated respondent's reasonable expectation of privacy, and that all information derived after the location of the cabin was a fruit of the illegal beeper monitoring.* 662 F. 2d 515

---

*Respondent does not challenge the warrantless installation of the beeper in the chloroform container, suggesting in oral argument that he did not believe he had standing to make such a challenge. We note that while several Courts of Appeals have approved warrantless installations, see *United States* v. *Bernard,* 625 F. 2d 854 (CA9 1980); *United States* v. *Lewis,* 621 F. 2d 1382 (CA5 1980), cert. denied, 450 U. S. 935 (1981); *United States* v. *Bruneau,* 594 F. 2d 1190 (CA8), cert. denied, 444 U. S. 847 (1979); *United States* v. *Miroyan,* 577 F. 2d 489 (CA9), cert. denied, 439 U. S. 896 (1978); *United States* v. *Cheshire,* 569 F. 2d 887 (CA5), cert. denied, 437 U. S. 907 (1978); *United States* v. *Curtis,* 562 F. 2d 1153 (CA9 1977), cert. denied, 439 U. S. 910 (1978); *United States* v. *Abel,* 548 F. 2d 591 (CA5), cert. denied, 431 U. S. 956 (1977); *United States* v. *Hufford,* 539 F. 2d 32 (CA9), cert. denied, 429 U. S. 1002 (1976), we have not before and do not now pass on the issue.

(1981). We granted certiorari, 457 U. S. 1131 (1982), and we now reverse the judgment of the Court of Appeals.

## II

In *Olmstead* v. *United States*, 277 U. S. 438 (1928), this Court held that the wiretapping of a defendant's private telephone line did not violate the Fourth Amendment because the wiretapping had been effectuated without a physical trespass by the Government. Justice Brandeis, joined by Justice Stone, dissented from that decision, believing that the actions of the Government in that case constituted an "unjustifiable intrusion . . . upon the privacy of the individual," and therefore a violation of the Fourth Amendment. *Id.*, at 478. Nearly 40 years later, in *Katz* v. *United States*, 389 U. S. 347 (1967), the Court overruled *Olmstead* saying that the Fourth Amendment's reach "cannot turn upon the presence or absence of a physical intrusion into any given enclosure." 389 U. S., at 353. The Court said:

> "The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment. The fact that the electronic device employed to achieve that end did not happen to penetrate the wall of the booth can have no constitutional significance." *Ibid.*

In *Smith* v. *Maryland*, 442 U. S. 735 (1979), we elaborated on the principles stated in *Katz:*

> "Consistently with *Katz*, this Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action. [Citations omitted.] This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces

two discrete questions. The first is whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy,' 389 U. S., at 361—whether, in the words of the *Katz* majority, the individual has shown that 'he seeks to preserve [something] as private.' *Id.*, at 351. The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as "reasonable,"' *id.*, at 361—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is 'justifiable' under the circumstances. *Id.*, at 353. *See Rakas* v. *Illinois*, 439 U. S., at 143–144, n. 12; *id.*, at 151 (concurring opinion); *United States* v. *White*, 401 U. S., at 752 (plurality opinion)." 442 U. S., at 740–741 (footnote omitted).

The governmental surveillance conducted by means of the beeper in this case amounted principally to the following of an automobile on public streets and highways. We have commented more than once on the diminished expectation of privacy in an automobile:

"One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." *Cardwell* v. *Lewis*, 417 U. S. 583, 590 (1974) (plurality opinion).

See also *Rakas* v. *Illinois*, 439 U. S. 128, 153–154, and n. 2 (1978) (POWELL, J., concurring); *South Dakota* v. *Opperman*, 428 U. S. 364, 368 (1976).

A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. When Petschen traveled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was traveling over par-

ticular roads in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property.

Respondent Knotts, as the owner of the cabin and surrounding premises to which Petschen drove, undoubtedly had the traditional expectation of privacy within a dwelling place insofar as the cabin was concerned:

> "Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also of grave concern, not only to the individual, but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or government enforcement agent." *Johnson* v. *United States*, 333 U. S. 10, 14 (1948), quoted with approval in *Payton* v. *New York*, 445 U. S. 573, 586 (1980).

But no such expectation of privacy extended to the visual observation of Petschen's automobile arriving on his premises after leaving a public highway, nor to movements of objects such as the drum of chloroform outside the cabin in the "open fields." *Hester* v. *United States*, 265 U. S. 57 (1924).

Visual surveillance from public places along Petschen's route or adjoining Knotts' premises would have sufficed to reveal all of these facts to the police. The fact that the officers in this case relied not only on visual surveillance, but also on the use of the beeper to signal the presence of Petschen's automobile to the police receiver, does not alter the situation. Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them in this case. In *United States* v. *Lee*, 274 U. S. 559 (1927), the Court said:

"But no search on the high seas is shown. The testimony of the boatswain shows that he used a searchlight. It is not shown that there was any exploration below decks or under hatches. For aught that appears, the cases of liquor were on deck and, like the defendants, were discovered before the motor boat was boarded. Such use of a searchlight is comparable to the use of a marine glass or a field glass. It is not prohibited by the Constitution." *Id.*, at 563.

We have recently had occasion to deal with another claim which was to some extent a factual counterpart of respondent's assertions here. In *Smith* v. *Maryland*, we said:

"This analysis dictates that [Smith] can claim no legitimate expectation of privacy here. When he used his phone, [Smith] voluntarily conveyed numerical information to the telephone company and 'exposed' that information to its equipment in the ordinary course of business. In so doing, [Smith] assumed the risk that the company would reveal to police the numbers he dialed. The switching equipment that processed those numbers is merely the modern counterpart of the operator who, in an earlier day, personally completed calls for the subscriber. [Smith] concedes that if he had placed his calls through an operator, he could claim no legitimate expectation of privacy. [Citation omitted.] We are not inclined to hold that a different constitutional result is required because the telephone company has decided to automate." 442 U. S., at 744–745.

Respondent does not actually quarrel with this analysis, though he expresses the generalized view that the result of the holding sought by the Government would be that "twenty-four hour surveillance of any citizen of this country will be possible, without judicial knowledge or supervision." Brief for Respondent 9 (footnote omitted). But the fact is that the "reality hardly suggests abuse," *Zurcher* v. *Stanford*

*Daily,* 436 U. S. 547, 566 (1978); if such dragnet-type law enforcement practices as respondent envisions should eventually occur, there will be time enough then to determine whether different constitutional principles may be applicable. *Ibid.* Insofar as respondent's complaint appears to be simply that scientific devices such as the beeper enabled the police to be more effective in detecting crime, it simply has no constitutional foundation. We have never equated police efficiency with unconstitutionality, and we decline to do so now.

Respondent specifically attacks the use of the beeper insofar as it was used to determine that the can of chloroform had come to rest on his property at Shell Lake, Wis. He repeatedly challenges the "use of the beeper to determine the location of the chemical drum at Respondent's premises," Brief for Respondent 26; he states that "[t]he government thus overlooks the fact that this case involves the sanctity of Respondent's residence, which is accorded the greatest protection available under the Fourth Amendment." *Ibid.* The Court of Appeals appears to have rested its decision on this ground:

> "As noted above, a principal rationale for allowing warrantless tracking of beepers, particularly beepers in or on an auto, is that beepers are merely a more effective means of observing what is already public. But people pass daily from public to private spheres. When police agents track bugged personal property without first obtaining a warrant, they must do so at the risk that this enhanced surveillance, intrusive at best, might push fortuitously and unreasonably into the private sphere protected by the Fourth Amendment." 662 F. 2d, at 518.

We think that respondent's contentions, and the above-quoted language from the opinion of the Court of Appeals, to some extent lose sight of the limited use which the government made of the signals from this particular beeper. As we have noted, nothing in this record indicates that the beeper

signal was received or relied upon after it had indicated that the drum containing the chloroform had ended its automotive journey at rest on respondent's premises in rural Wisconsin. Admittedly, because of the failure of the visual surveillance, the beeper enabled the law enforcement officials in this case to ascertain the ultimate resting place of the chloroform when they would not have been able to do so had they relied solely on their naked eyes. But scientific enhancement of this sort raises no constitutional issues which visual surveillance would not also raise. A police car following Petschen at a distance throughout his journey could have observed him leaving the public highway and arriving at the cabin owned by respondent, with the drum of chloroform still in the car. This fact, along with others, was used by the government in obtaining a search warrant which led to the discovery of the clandestine drug laboratory. But there is no indication that the beeper was used in any way to reveal information as to the movement of the drum within the cabin, or in any way that would not have been visible to the naked eye from outside the cabin. Just as notions of physical trespass based on the law of real property were not dispositive in *Katz* v. *United States*, 389 U. S. 347 (1967), neither were they dispositive in *Hester* v. *United States*, 265 U. S. 57 (1924).

We thus return to the question posed at the beginning of our inquiry in discussing *Katz, supra;* did monitoring the beeper signals complained of by respondent invade any legitimate expectation of privacy on his part? For the reasons previously stated, we hold it did not. Since it did not, there was neither a "search" nor a "seizure" within the contemplation of the Fourth Amendment. The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in the judgment.

I join JUSTICE BLACKMUN's and JUSTICE STEVENS' opinions concurring in the judgment. I should add, however,

that I think this would have been a much more difficult case if respondent had challenged, not merely certain aspects of the monitoring of the beeper installed in the chloroform container purchased by respondent's compatriot, but also its original installation. See *ante*, at 279, n. *Katz* v. *United States*, 389 U. S. 347 (1967), made quite clear that the Fourth Amendment protects against governmental invasions of a person's reasonable "expectation[s] of privacy," even when those invasions are not accompanied by physical intrusions. Cases such as *Silverman* v. *United States*, 365 U. S. 505, 509–512 (1961), however, hold that, when the Government *does* engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment even if the same information could have been obtained by other means. I do not believe that *Katz*, or its progeny, have eroded that principle. Cf. The Supreme Court, 1979 Term, 94 Harv. L. Rev. 75, 203–204 (1980).

I am also entirely unconvinced by the Court of Appeals' footnote disposing of the installation issue with the statement: "we hold that the consent of the owner [of the chloroform drum] at the time of installation meets the requirements of the Fourth Amendment, even if the consenting owner intends to soon sell the 'bugged' property to an unsuspecting buyer. *Caveat emptor.*" 662 F. 2d 515, 517, n. 2 (1981) (citation omitted). The Government is not here defending against a claim for damages in an action for breach of a warranty; it is attempting to justify the legality of a search conducted in the course of a criminal investigation. I am not at all sure that, for purposes of the Fourth Amendment, there is a constitutionally significant difference between planting a beeper in an object in the possession of a criminal suspect and purposefully arranging that he be sold an object that, unknown to him, already has a beeper installed inside it. Cf. *Gouled* v. *United States*, 255 U. S. 298, 305–306 (1921); *Lewis* v. *United States*, 385 U. S. 206, 211 (1966).

Respondent claimed at oral argument that, under this Court's cases, he would not have standing to challenge the original installation of the beeper in the chloroform drum because the drum was sold, not to him, but to one of his compatriots. See *ante*, at 279, n. If respondent is correct, that would only confirm for me the formalism and confusion in this Court's recent attempts to redefine Fourth Amendment standing. See *Rawlings* v. *Kentucky*, 448 U. S. 98, 114 (1980) (MARSHALL, J., dissenting); *Rakas* v. *Illinois*, 439 U. S. 128, 156 (1978) (WHITE, J., dissenting).

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, concurring in the judgment.

The Court's opinion gratuitously refers to the "open fields" doctrine and twice cites *Hester* v. *United States*, 265 U. S. 57 (1924). *Ante*, at 282 and 285. For me, the present case does not concern the open fields doctrine, and I regard these references and citations as unnecessary for the Court's decision. Furthermore, and most important, cases concerning the open fields doctrine have been accepted by the Court for argument and plenary consideration. *State* v. *Brady*, 406 So. 2d 1093 (Fla.), cert. granted, 456 U. S. 988 (1982); *United States* v. *Oliver*, 686 F. 2d 356 (CA6 1982), cert. granted, 459 U. S. 1168 (1983). See also *United States* v. *Dunn*, 674 F. 2d 1093 (CA5 1982), cert. pending, No. 82–508.

It would be unfortunate to provide either side in these granted cases with support, directly or by implication, for its position, and I surely do not wish to decide those cases in this one. Although the Court does not indicate its view on how such cases should be decided, I would defer all comments about open fields to a case that concerns that subject and in which we have the benefit of briefs and oral argument.

I therefore do not join the Court's opinion. I concur only in the result it reaches.

JUSTICE STEVENS, with whom JUSTICE BRENNAN, and JUSTICE MARSHALL join, concurring in the judgment.

Since the respondent in this case has never questioned the installation of the radio transmitter in the chloroform drum, see *ante*, at 279, n., I agree that it was entirely reasonable for the police officers to make use of the information received over the airwaves when they were trying to ascertain the ultimate destination of the chloroform. I do not join the Court's opinion, however, because it contains two unnecessarily broad dicta: one distorts the record in this case, and both may prove confusing to courts that must apply this decision in the future.

First, the Court implies that the chloroform drum was parading in "open fields" outside of the cabin, in a manner tantamount to its public display on the highways. See *ante*, at 282. The record does not support that implication. As JUSTICE BLACKMUN points out, this case does not pose any "open fields" issue.

Second, the Court suggests that the Fourth Amendment does not inhibit "the police from augmenting the sensory faculties bestowed upon them at birth with such enhancement as science and technology afforded them." *Ibid.* But the Court held to the contrary in *Katz* v. *United States*, 389 U. S. 347 (1967). Although the augmentation in this case was unobjectionable, it by no means follows that the use of electronic detection techniques does not implicate especially sensitive concerns.

Accordingly, I concur in the judgment.