771 A.2d 536

Larry **GIBSON**

v.

**STATE of Maryland.**

**No. 1764, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

May 1, 2001.

**400**

---

Robert Bonsib (Beau Kealy and Marcus & Bonsib on the brief), Greenbelt, for appellant.

Zoe M. Gillen, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Douglas Gansler, State's Atty. for Montgomery County, Rockville, on brief), for appellee.

Argued before MURPHY, C.J., DEBORAH S. EYLER, and CHARLES E. MOYLAN, Jr., (retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge.

The appellant, Larry Gibson, was convicted by a Montgomery County jury, presided over by Judge James C. Chapin, of armed robbery and first-degree burglary. On this appeal, he raises the four contentions

1. that his allegedly Fourth Amendment-violative detention in an unrelated case two and one-half months before the crime in issue rendered the entire investigation in the present case excludable as the "fruit of the poisonous tree;"

2. that his confession was the involuntary product of impermissible promises and inducements;

3. that he was erroneously subjected to a mandatory sentence because of the State's failure formally to allege and to prove to the jury the pivotal aggravating factor; and

4. that unreliable and unauthenticated documents were erroneously admitted at the sentencing hearing.

### "Fruit of the Poisonous Tree" Doctrine

The appellant seeks the only solace he can hope to find in the "fruit of the poisonous tree" doctrine. That doctrine traces back to *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). It deals with the second generation exclusion of indirect or derivative evidence and was explained by Justice Holmes:

The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall

not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible.

251 U.S. at 392, 40 S.Ct. 182.

In *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939), it was Justice Frankfurter who first employed the term "derivative evidence" and who coined the felicitous label "the fruit of the poisonous tree" doctrine. It was also Justice Frankfurter who first recognized a limitation on the doctrine's reach, as he pointed out that between the original illegality and the ultimate derivative evidence, the "connection may have become so attenuated as to dissipate the taint." 308 U.S. at 341, 60 S.Ct. 266.

It has come to be recognized that there are three ways of what has colorfully been described as "unpoisoning the fruit." Less colorfully but more accurately, these are actually three ways of determining that the fruit was not poisoned in the first instance.

The first, presaged by Justice Frankfurter in *Nardone,* is the attenuation of taint. *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), rejected a "but for" rule in applying the doctrine and explained that the proper question to be answered with respect to derivative evidence is

"whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

Tony Amsterdam, *Search, Seizure, and Section 2255: A Comment,* 112 U. Pa. L.Rev. 378, 390 (1964), pointed out that the underlying purpose of the attenuation test is to mark "the point of diminishing returns of the deterrence principle."

A second way of determining that evidence is not poisoned fruit, notwithstanding a suspicious "post hoc—propter hoc" time sequence, is when the evidence has proceeded from an independent source. *Murray v. United States,* 487 U.S. 533,

537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), explained that the "independent source" exception applies not

"only to evidence obtained for the first time during an independent lawful search," but "also to evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality."

A third way of determining that derivative evidence is not excludable is a finding of "inevitable discovery." The lead case on that exemption is *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984):

It is clear that the cases implementing the exclusionary rule "begin with the premise that the challenged evidence is *in some sense* the product of illegal governmental activity." Of course, this does not end the inquiry. If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.

■ A defendant seeking shelter under the umbrella of the "fruit of the poisonous tree" doctrine has to prove each of two propositions: 1) the primary illegality, to wit, that the tree was poisonous; and 2) the cause and effect relationship between the primary illegality and the evidence in issue, to wit, that the evidence was, indeed, the identifiable fruit of that particular tree.

### The Pertinent Chronology: From A To C To B

Because three unrelated criminal incidents figure in this case, the chronology could become confusing. In an effort to foreclose such confusion, let us set out the three key dates and their relationship to each other.

A. **NOVEMBER 11, 1998:** A resident of Bethesda reported a burglary in progress at approximately 4:00 A.M. that morning. The police, responding to the scene, 1) observed, 2) stopped, and 3) questioned the appellant.

That incident never led to a prosecution because the homeowner, having observed only the top of the intruder's head, could not make an identification.

This incident only has significance in this case because the appellant claims 1) that the stopping of him that morning was a violation of the Fourth Amendment and 2) that a surveillance of him three months later for an unrelated crime was the tainted "fruit" of that earlier "poisonous tree."

**B. JANUARY 27, 1999:** Marilyn Mills, a resident of Silver Spring, was awakened at approximately 4:00 A.M. by an intruder in her bedroom. She was robbed at knife point and sexually threatened.

It is only the conviction for this crime which is now on appellate review. Ironically, the details of this crime, unlike what went before and unlike what came after, do not figure in our analysis of any of the issues on this appeal.

The key evidence against the appellant for this crime was a taped confession to it which he gave after being arrested for an unrelated crime almost three weeks later.

**C. FEBRUARY 14–15, 1999:** During the early morning hours of February 14, the police conducted a surveillance on the movements of the appellant. He was observed driving to Bethesda at about 4:00 A.M., putting on a ski cap and gloves, and ultimately opening first the rear screen door and then the front screen door of a home at 5023 Acacia Avenue. The appellant was later arrested on the early morning of February 15 for this attempted burglary. It was in the course of being interrogated as a result of that arrest that the appellant confessed to the unrelated robbery and burglary of Marilyn Mills on January 27.

The appellant claims that the police would never have conducted the surveillance that led to the issuance of an arrest warrant on February 14 if they had not known his name and address as a result of the allegedly unconstitutional stopping of him back on November 11. In effect, the appellant claims

that the key evidence at his trial for Crime B came as a result of an arrest for Crime C which was tainted by evidence allegedly improperly obtained in the investigation of Crime A.

### "Fruit of the Poisonous Tree" Doctrine as Urged by the Appellant

At a pretrial suppression hearing, the appellant went to great lengths to try to establish, albeit without success, that two-and-one-half months before the January 27 commission of the crime in this case, he was unconstitutionally stopped on November 11 and questioned about an unrelated attempted burglary. He argues, quite accurately, that the Montgomery County Police thereby learned his identity and his home address. They knew, moreover, that he had been stopped because he was spotted on November 11 by them in suspicious proximity to an apparent burglary attempt in a residential neighborhood seven miles distant from his own home at approximately 4:30 in the morning. He argues that the police thereby kept him in mind, as a possible suspect worthy of at least further investigation, whenever an early-morning burglary should take place in that general area of Montgomery County.

He maintains that that awareness and focus is the "fruit of the poisonous tree" and that any information learned or observations made, even if themselves facially unobjectionable, should be excluded from future trials of future crimes if such information probably would not have been learned or such observations probably would not have been made if his identity had remained unknown to the police. He argues, in effect, that the alleged police over-reaction on November 11, 1998, endowed him with a broad transactional immunity from any future investigation that might be facilitated by police knowledge of who he was and where he lived. He wants, in effect, a "Get Out of Jail Free" card with no expiration date.

### Finessing the Question of the Primary Illegality

Our initial and cursory reflection on the events of November 11, 1998, yields the strong tentative belief that there was

nothing at all unreasonable about the brief initial stopping of the appellant that produced the police knowledge of his name and address as the person seen in the neighborhood of the attempted burglary.

At approximately 4:00 A.M. on November 11, the Montgomery County Police responded to a call reporting a burglary at 5005 Allen Road in Bethesda. The house owner reported seeing a black male dressed in black attempting to break into her basement window.

Officer Brett Trahan was responding to the scene approximately ten minutes after the burglary was first called in. He approached the neighborhood in a marked police cruiser but with the lights off. At the intersection of Allen Road and Jamestown Road, approximately five houses from the scene of the attempted burglary, Officer Trahan observed a car pulling away from the curb. The officer followed the suspect car on a meandering and indirect route out of the residential neighborhood. When the suspect car ended up doing a speed of 55 miles per hour in a 25–mile zone, Officer Trahan stopped it.

Before Officer Trahan stopped the car, he determined that it was a blue Lexus with a Maryland registration. The officer ran a registration check and discovered that the car was registered to the appellant at an address in Silver Spring approximately seven miles from the site of the attempted burglary in Bethesda. The car was occupied only by the appellant, a black male. Immediately after stopping the appellant, Officer Trahan asked him what he had been doing in the Allen Road neighborhood. The appellant denied ever having been in the neighborhood. The appellant explained that he was out at that hour because he was a delivery man for medical supplies and was "trying to get some route down" that he had to travel the next day.

If the issue were before us, it is hard to imagine finding anything improper about that stop or the first minute or so of ensuing conversation. Anything that happened after that, while arguably quite proper, had no remote impact on this case. After ruling that Officer Trahan's stopping of the

appellant was reasonably based on articulable suspicion pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), Judge Chapin offered the further thought, with which it is hard to disagree, that "if the police officer hadn't done that, as a citizen of the county I would file a letter of complaint against him."

It is, however, unnecessary that we expend time or effort to engage in a more intensive legal analysis of police conduct on November 11 that we conclude is, in any event, utterly immaterial to any issue now before us. The simple fact is that the November 11 stop in this case, be it a poisonous or a non-poisonous tree, bore no fruit that was ever offered against the appellant. Although the appellant complains about a search warrant, there is no search issue before us, for neither physical evidence nor any other product of a search was ever offered against the appellant.

We elect not to base our decision on this contention on the subissue of proof of the primary illegality, lest we distract from the significance of our holding with respect to the other subissue, the establishment of the necessary cause-and-effect relationship between the "tree" and its alleged "fruit."

### The Confession As An Alleged Fruit

The appellant boldly asserts, but does not support with law or logical argument, that his confession of February 15, 1999 was *ipso facto* involuntary as the unattenuated product of an unlawful arrest. He fails to establish, however, the fact of any unlawful arrest.

### The Legality of the February 15 Arrest

It is a single police action that calls for any Fourth Amendment scrutiny in this case. The arrest that immediately preceded and was the occasion for the appellant's interrogation in this case was made by Detective Edward Tarney at the appellant's home at approximately 1 A.M. on February 15, 1999. That arrest was pursuant to a warrant of arrest issued to Det. Tarney by District Court Commissioner M.T. Nasser three hours earlier at 10:08 P.M. on February 14.

In terms of the supporting probable cause, sworn to by Det. Tarney, the warrant was on its face unassailable. Although the appellant's subsequent confession revealed his guilt in the trial now under review, the arrest was for the unrelated third-degree burglary of the home of Ms. Debbie Boylen at 5023 Acacia Avenue on the early morning of February 14. The following pertinent passage from the warrant application established, in and of itself, probable cause for the issuance of the warrant:

During a surveillance on 02–14–99 Gibson again left his residence, operating a 1995 Lexus, Md tag EZL914 which is registered to his wife, Cynthia Gibson. He was followed to Bethesda where he was observed parking this vehicle on Bardon Rd. at Cedar Ave. Gibson was wearing a red jogging suit with a hood. As Gibson was walking in the neighborhood he was observed placing a dark ski cap and gloves on. The time was approximately 0419 hours. Gibson was observed in the front yard of 5023 Acacia Ave. Officer David Hardy observed a motion detector light come on at this residence and the subject, Gibson, run from the area. He made his way through back yards to his vehicle in a hurried manner and returned home.

At approximately 0625 hours Cpl. Auger made contact with the resident of 5023 Acacia Ave., a Debbie Boylen who was inside that address when the motion detector was activated. She reported that she heard the rear door opening. She observed a figure approach the front door and heard the front screen door open. When Boylen looked outside she observed a subject she believed to be an adult black male wearing a red jogging suit wearing a hood. When Boylen and this subject made eye contact, the subject ran.

### The Arrest Warrant Was Never Expressly Challenged

It is significant that the appellant never challenged or even focused attention on the arrest warrant issued on the evening of February 14. There was no request for a "taint hearing" with respect to it pursuant to *Franks v. Delaware,* 438 U.S.

154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). What the appellant may be mounting is not an eleventh-hour attack on the arrest warrant of February 14 but a thirteenth-hour attack that untimely comes, like the Battle of New Orleans, after the war is over. Because the attack would not have carried the day, however, even had it been timely mounted, we will consider its implications further.

### Probable Cause For the Arrest Warrant

In addition to the surveillance of February 14, which alone established probable cause for the issuance of the arrest warrant, the warrant application recited the details of the robbery-burglary perpetrated on Marilyn Mills on January 27 at 3:20 A.M. It recited that the appellant lived "only a few blocks" away and it detailed how the early morning surveillance of February 12 observed the appellant's jogging by the scene of that crime and "seem[ing] to pay particular attention to the Marilyn Mills residence" before "he went into a neighbor's back yard." The warrant application also recited that the appellant "had recently been paroled from the State of New York and has a history of similar offenses."

■ The warrant application, to be sure, also included the single sentence reciting that the appellant had been "stopped by the Montgomery County Police on 11–11–98 at approximately 0400 hours leaving the area of a burglary" in Bethesda. Even if we were to assume, purely for the sake of argument, that the November 11 stop of the appellant was improper, the subtracting of that brief recitation, of *de minimis* significance, from the warrant application would not have diminished the probable cause in the slightest. No "taint hearing" under *Franks v. Delaware* would have been justified, even had the appellant called for one (he did not).

### Pushing Out the Envelope

At oral argument, however, and somewhat tentatively, the appellant championed a more virulent strain of the "fruit of the poisonous tree" doctrine that, if ever loosed upon the law, would not contaminate a piece of fruit or two in a single

orchard but would blight and level entire forests. He argues that **BUT FOR** their stopping of him on November 11, the police would never have learned 1) his identity, 2) his lengthy history of burglary and his parole status in New York, and 3) the fact that he lived a few blocks from the scene of the January 27 crime. He argues further that **BUT FOR** that information, they would have had no occasion to be parked across the street from his home during the early morning hours of February 12 and February 14 in a position to make the observations they did after he left his house. He argues finally that those observations are excludable "fruits of the poisonous tree."

The appellant's argument is a four-step affair. 1) The admissibility of the confession depended on the legality of its antecedent arrest. 2) The legality of the arrest depended on the adequacy of the probable cause in the application for the arrest warrant. 3) The adequacy of the probable cause depended on the surveillances of February 12 and February 14. 4) Those surveillances would never have been conducted, although legally they could have been, if the police, three months earlier, had not learned who the appellant was and where he lived.

The potential contagion, however, is not nearly so epidemic. The appellant's argument soon reduces itself to an absurdity. If the police were where they were only because they knew it was the appellant's house, their lips, his argument would insist, would be forever sealed as to what they there might see. If the police were to observe, for instance, the appellant 1) come out of his house and gun down a victim in the middle of the street, 2) drive downtown and hold up a bank, or 3) shoot at the officers themselves, they would be prohibited from testifying to those allegedly "tainted" observations. One might as readily argue that if the G-men had not been overzealously hot on the trail of Al Capone for bootlegging, the IRS would never have thought to audit his income tax returns. Perhaps so, but so what?

Even assuming, *arguendo*, that the stop on November 11 was bad (we are not remotely suggesting that it was), that would not operate to bar from evidence or from other uses the police observations of February 12 and February 14.

■ The admissibility of the observations would be clear whether considered as an instance of the attenuation of the initial taint, *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978), or as the product of an independent source, *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

### The Appellant's Movements of February 12 & 14 Were Not Shielded by the Fourth Amendment

■ In *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), the defendants complained that **BUT FOR** an unconstitutionally placed "beeper" device, at one point monitored from an airplane, the police would never have been able to maintain a successful surveillance of them as they traveled in their automobile. The Supreme Court opinion made it clear that it did not matter how the police were able to follow the suspects, so long as the surveillance itself did not intrude on a privacy interest protected by the Fourth Amendment.

The governmental surveillance conducted by means of the beeper in this case amounted principally to the following of an automobile on public streets and highways.

. . . .

A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. *When Petschen traveled over the public streets he voluntarily conveyed to anyone who wanted to look the fact that he was traveling over particular roads* in a particular direction, the fact of whatever stops he made, and the fact of his final destination when he exited from public roads onto private property.

460 U.S. at 281–82, 103 S.Ct. 1081 (emphasis supplied). In this case, none of the police observations of the appellant during the early morning surveillances of February 12 and February 14 implicated in any way any Fourth Amendment protection enjoyed by him. In those wee morning hours, the appellant "voluntarily conveyed to anyone who wanted to look" his suspicious meanderings through the yards and neighborhoods of Montgomery County.

*United States v. Knotts, supra,* is doubly instructive. If the appellant's challenge to the police surveillances of February 12 and February 14 fails, all else fails. It is the appellant's core argument that the police would never have conducted the surveillances where they did and when they did if they had not known, as a result of the November 11 stop, that the appellant lived at that location and possibly had an unusual habit of going abroad in the wee hours of the morning. It is the teaching of *United States v. Knotts,* however, that if the informed surveillance revealed nothing that a completely random surveillance at that precise time and place would not similarly have revealed, had such a random surveillance been conducted, then no constitutionally protected right was in any way infringed.

The surveillance in *United States v. Knotts* was challenged because its successful execution had depended on the technologically enhanced monitoring of a discretely placed "beeper" device. The Supreme Court reasoned that everything revealed by the actual challenged surveillance theoretically could as readily have been revealed by an unchallengeable visual surveillance, had one been conducted.

Visual surveillance from public places along Petschen's route or adjoining Knotts' premises would have sufficed to reveal all of these facts to the police. The fact that the officers in this case relied not only on visual surveillance, but also on the use of the beeper to signal the presence of Petschen's automobile to the police receiver, does not alter the situation. Nothing in the Fourth Amendment prohibited the police from augmenting the sensory faculties be-

stowed upon them at birth with such enhancement as science and technology afforded them in this case.

460 U.S. at 282, 103 S.Ct. 1081. And see *United States v. Karo*, 468 U.S. 705, 713–14, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984).

In our case, the actual surveillances of February 12 and February 14, conducted because of an educated hunch, revealed nothing that would not similarly have been revealed by purely random surveillances, had blind chance been the occasion for them at that precise place at those precise times. As long as the police had the constitutional right to do what they did, we do not care why they did it. *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The objectively unassailable surveillances of February 12 and 14 represent a total break in any arguable chain of causation.

### No One Has A Right To Be An Anonym

■ Quite aside from the irreparable break in any arguable chain of causation, we find equally dispositive, as an alternative rationale, the principle that a person's name and address are not excludable evidence and may not serve either as second-generation excludable "fruits" or as the first-generation "poisonous tree" that may yield such fruits.

No less than a person's location on public streets and highways, a potential suspect's identity, however discovered, is fair game. In *Billinger v. State*, 9 Md.App. 628, 629, 267 A.2d 275 (1970), Judge Orth began the opinion of this Court with this statement: "In our society no person has a constitutional right to be an anonym." In a closely related context, the Supreme Court in *California v. Byers*, 402 U.S. 424, 432, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971), held that the Fifth Amendment privilege against compelled self-incrimination does not shield a motorist from having to reveal his identity and his address:

"Disclosure of name and address is an essentially neutral act."

In *INS v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), Lopez Mendoza claimed that a deportation order against him should have been vacated because the authorities would never have learned of his identity or his presence in the United States but for their earlier illegal arrest of him. In rejecting his claim, the Supreme Court stated:

> The "body" or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred.

468 U.S. at 1039, 104 S.Ct. 3479.

The argument that **BUT FOR** an illegal arrest, the police would never have had custody of the defendant, would never have known his identity, and would never have been able to prosecute him has never held weight. *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), explained:

> An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction. Gerstein v. Pugh, 420 U.S. 103, 119, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975); Frisbie v. Collins, 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952); Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886).

██ If the body or the identity of a defendant is not suppressible at the "effect" end of a "cause and effect" chain, neither may it serve as the contaminating agent at the "cause" end of the same chain.

In *United States v. Guzman–Bruno*, 27 F.3d 420 (9th Cir.1994), the defendant argued that the authorities only learned of his identity and of his criminal record because of their earlier illegal arrest of him. In rejecting this argument that either his identity or his criminal record were excludable "fruits of the poisonous tree," the Ninth Circuit held:

> Guzman–Bruno argues that the district court should have suppressed all evidence of his identity learned in connection with the illegal arrest. Because the government does not

contest the district court's ruling that the arrest was illegal, we assume for purposes of our analysis that it was illegal....

A defendant's identity need not be suppressed merely because it is discovered as the result of an illegal arrest or search. "There is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity." "The 'body' or identity of a defendant ... is never itself suppressible as a fruit of an unlawful arrest."

27 F.3d at 421–22.

The holding in *Hoonsilapa v. INS*, 575 F.2d 735, 738 (9th Cir.1978), is similarly damaging to the appellant's cause:

It is well settled in this circuit that the mere fact that Fourth Amendment illegality directs attention to a particular suspect does not require exclusion of evidence subsequently unearthed from independent sources.... We hold that there is no sanction to be applied when an illegal arrest only leads to discovery of the man's identity and that merely leads to the official file. The file can be used so far as relevant.

See also *United States v. Cella*, 568 F.2d 1266, 1285–86 (9th Cir.1977) ("To grant life-long immunity from investigation and prosecution simply because a violation of the Fourth Amendment first indicated to the police that a man was not the law-abiding citizen he purported to be would stretch the exclusionary rule beyond tolerable bounds.").

Under circumstances closely analogous to those before us, the Supreme Court of California in *People v. McInnis*, 6 Cal.3d 821, 100 Cal.Rptr. 618, 494 P.2d 690 (1972), agreed that the police had a photograph of the defendant only as a result of an earlier illegal arrest of him. That history, however, did not bar its use in a photographic array for a later and unrelated crime. The California Supreme Court, reasoning that there had been an attenuation of taint, held:

To hold that all such pictures resulting from illegal arrests are inadmissible forever because they are "fruits of the poisonous tree" would not merely permit the criminal

"to go free because the constable has blundered" * * * but would allow the criminal immunity because another constable in another jurisdiction in another case had blundered. It would in effect be giving a crime insurance policy in perpetuity to all persons once illegally arrested: if the photograph of a person obtained because of such an arrest becomes instrumental in the identification of that person for a crime committed many years later, it could be urged that *but for* the old illegal arrest the criminal would not have been identified. Rationally, however, a "but for" relationship alone is insufficient to render the photograph inadmissible since it cannot be said that many years later the illegality of the earlier arrest was being "exploited." * * *

In the case at bar, while the time span between the illegal arrest and the robbery was not one of years but only a month, nevertheless the principle remains the same, and there is no evidence whatsoever of exploitation. As indicated, countless mug shots were presented to the victim and the witness, some within minutes of the robbery. Indeed, the circumstances under which this particular photograph was exhibited were essentially fortuitous.

494 P.2d at 693.

In *Robinson v. State*, 53 Md.App. 297, 452 A.2d 1291 (1982), this Court, speaking through Judge Wilner, followed the California Supreme Court's decision in *People v. McInnis, supra.* Two armed robbery victims picked the defendant's picture from a photographic array. At a pretrial suppression hearing, the defendant sought to show that his photograph was the product of an illegal arrest in an unrelated case. We reasoned that the circumstances of that arrest were immaterial and could not in any event trigger the suppression of the identification in the robbery case before the court:

Whether appellant's warrantless arrest on May 5 was legal or illegal, it had absolutely nothing whatever to do with this case. Unlike the situation in *Crews* there was not even a suggestion here, much less a proffer of evidence, that appellant was arrested (or photographed) as a pretext for gathering evidence in this case. *Compare also Davis v.*

*Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). Indeed, an entire month elapsed before the photograph was even shown to Foster and Beuchert.

53 Md.App. at 310, 452 A.2d 1291. Our final holding was clear:

In the absence of evidence (or a reasonably firm and detailed proffer of evidence) tending to show that appellant's May 5 arrest was not only illegal but was merely a pretext for a general exploratory search or for gathering evidence in this case, a routine "booking" photograph taken as a consequence of that arrest would not be suppressible as tainted fruit in this proceeding. Accordingly, the legality or illegality of the May 5 arrest, standing alone, was quite irrelevant to the suppression issue, and the court therefore committed no error in foreclosing an inquiry into it.

53 Md.App. at 312–13, 452 A.2d 1291.

With respect to information routinely in the police files, however it was initially obtained, the observation of Wayne R. LaFave, 5 *Search and Seizure* (3d ed.1996), Sect. 11.4(g), pp. 320–21, is pertinent:

Because photographs are typically taken as a matter of routine in the course of booking and because these photographs become a permanent part of the police files, it sometimes happens that a photo routinely taken after an illegal arrest will on some future occasion be utilized to connect a person with some other crime totally unrelated to the reasons why the pre-photographing illegal arrest was made. Under these circumstances, courts are inclined to find attenuation.

See also *State v. Price,* 27 Ariz.App. 673, 558 P.2d 701 (1976) (defendant photographed after illegal drug arrest, picture later used in investigation of robbery); *State v. Maier,* 378 So.2d 1288 (Fla.App.1979); *People v. Price,* 76 Ill.App.3d 613, 31 Ill.Dec. 879, 394 N.E.2d 1256 (1979) (defendant photographed after illegal disorderly conduct arrest, later photo used to connect defendant to post-arrest robbery; *Edmons* distinguished and identification held not tainted, as arrest was

not flagrant or for purpose of securing information); *State v. Tyrrell,* 234 Neb. 901, 453 N.W.2d 104 (1990) (defendant's photo, taken after illegal arrest for burglary in one city, later used by police in other city as part of photo lineup re sexual assault).

■ We hold that the stop of the appellant on November 11, constitutional or unconstitutional, had no effect on the confession he gave to the police in this case on February 15.

## Voluntariness of the Confession

■ The appellant also attacks the admission of his confession by opening a second front. He acknowledges that the federal constitutional requirements of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were fully satisfied. He invokes, instead, the misbegotten ghost of *Hillard v. State,* 286 Md. 145, 406 A.2d 415 (1979), and urges that his confession, albeit unassailable under federal law, was nonetheless involuntary under the common law of Maryland.

In his appellate brief, the appellant catalogues the implied promises and inducements:

It is clear that by first clearly warning the Appellant of the severe sentences he was facing, reminding him that he was on parole and then offering some hope and "a light at the end of the tunnel" that the interrogators were letting the Appellant believe that if he cooperated with them by admitting to involvement in the charged offenses and others that things would go better for him and that he could expect a lighter sentence or perhaps he would be permitted to go into a program rather than jail.

The appellant then goes on to describe the erosive effect that those implied promises and inducements had on his resolve to remain silent:

The Appellant clearly testified to the effect that these promises and inducements had on his decision to admit to involvement in the various offenses being investigated by the police. He was lead to believe that in Montgomery County there are programs that the court uses as an

alternative to jail. He testified that he was listening to what the police were telling him and because of this hope they were giving him that he decided to talk to the police and decided to tell them that he was involved in a series of burglary related offenses.

Unfortunately from the appellant's point of view, there is before us no evidence of any such promises or inducements. The only proffered source of such evidence was the suppression hearing testimony of the appellant himself. Judge Chapin, however, as was his fact-finding prerogative, utterly disbelieved the appellant.

> The defendant argues that he somehow was urged to say what the police wanted him to say because of statements made by the police that led him to believe that if he did that he might have some alternative future other than one behind bars because of the magnificence of Montgomery County and its very many treatment facilities and programs.
>
> *The Court simply doesn't believe that. It is that simple.* By a preponderance of the evidence *the Court does not believe the testimony of the defendant that such assurances or innuendos or inferences were made to him.*

(Emphasis supplied). If the only source of evidence is completely disbelieved, the net effect is that there is no such evidence in the case.

On the other side of the ledger of proof, Det. Nichols, who was present during the entire interrogation process, testified that no promises or inducements of any sort were ever made to the appellant. Judge Chapin accepted as true Det. Nichols's version of events:

> "*The Court chooses to accept the testimony of the police officer* ... that there were no promises or urgings made to [the appellant]."

(Emphasis supplied). The finding of Judge Chapin was not clearly erroneous and are, therefore, binding on us.

Even if we did not have the benefit of Judge Chapin's express findings as to incredibility and credibility, respective-

ly, we would necessarily reach the same result. The appellant testified that inducements were made; Det. Nichols testified that they were not. If we had no fact-finding by the hearing judge, we would be enjoined to accept that version of the facts most favorable to the State. The version most favorable to the State was Det. Nichols's version. According to that version, there was no evidence of any involuntariness.

## Enhanced Sentencing And *Apprendi v. New Jersey*

The maximum penalty for robbery with a dangerous and deadly weapon is ordinarily twenty years incarceration. Art. 27, Sect. 488. As a "three time loser," however, the appellant received an enhanced sentence of twenty-five years pursuant to Art. 27, Sect. 643B. He now invokes the recent Supreme Court decision of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and, relying on it, argues that the failure of the State 1) to charge the enhancing factor in the indictment, 2) to submit the enhancing factor as an issue for the jury, and 3) to require that the enhancing factor be proved beyond a reasonable doubt resulted in a fatally flawed enhanced sentence.

■ Justice Stevens's opinion for the Supreme Court, however, makes it very clear that the rule of *Apprendi* does not apply when the sentencing-enhancing factor is, as in the case now before us, a prior conviction.

> *Other than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

120 S.Ct. at 2362–63, 147 L.Ed.2d at 455 (emphasis supplied).

The precise contention the appellant now makes was recently before this Court in *Jones v. State*, 138 Md.App. 12, 769 A.2d 1015 (2001). We held, speaking through Judge Thieme:

> In our view, *Apprendi* does not require a jury determination of prior convictions or incarceration resulting from those convictions.

See also *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998); *Wadlow v. State*, 335 Md. 122, 128–29, 642 A.2d 213 (1994).

### Proof of Prior Convictions

 The appellant was sentenced as a "three-time loser" under the provisions of Art. 27, Sect. 643B(c), which provides in pertinent part that

> any person who (1) has been convicted on two separate occasions of a crime of violence where the convictions do not arise from a single incident, and (2) has served at least one term of confinement in a correctional institution as a result of a conviction of a crime of violence, shall be sentenced, on being convicted a third time of a crime of violence, to imprisonment for the term allowed by law, but, in any event, not less than 25 years.

Judge Chapin found as a fact the prior convictions for qualifying offenses and two separate periods of incarceration—all in the State of New York. The State introduced at the sentencing hearing a plethora of documents and certifications from New York attesting to the convictions.

For present purposes, however, it is enough to point out that the appellant himself, under cross-examination at the pretrial suppression hearing on July 16, 1999, acknowledged under oath his New York convictions and incarcerations. He testified that he had been 1) convicted of robbery in Nassau County, New York, in 1968 and sentenced to a term of four years; 2) convicted of second-degree robbery in Nassau County in 1970 and sentenced to a term of thirteen years; and 3) convicted of robbery, burglary, and attempted escape in Duchess County, New York, and sentenced to a term of between twelve and a half and twenty-five years, a sentence for which he was still on parole. *Beard v. State*, 216 Md. 302, 308–13, 140 A.2d 672 (1958). See also *Teeter v. State*, 65 Md.App. 105, 113, 499 A.2d 503 (1985); *Sutton v. State*, 128 Md.App. 308, 328, 738 A.2d 286 (1999).

We see no error in the sentencing.

JUDGMENTS OF CONVICTION AFFIRMED; COSTS
TO BE PAID BY APPELLANT.