FLAUM, Circuit Judge,
concurring.
I share Judge Cudahy’s view that this appeal’s outcome is governed by United States v. Garcia, 474 F.3d 994 (7th Cir.2007), and join the opinion of the court to that extent. I write separately, however, because the opinion could be read to imply that, on different facts, we might adopt the D.C. Circuit’s reasoning in United States v. Maynard, 615 F.3d 544 (D.C.Cir.2010) (reversing a denial of a motion to suppress evidence where the government used GPS tracking for 28 days and announcing a “mosaic” conception of Fourth Amendment searches). The dissenting opinion of Judge Wood leaves no doubt, maintaining that Maynard’s time is now.
I believe that Maynard is wrongly decided. The opinion incorrectly concludes that United States v. Knotts, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) (holding that a person does not have a reasonable expectation of privacy in movements from one place to another on public thoroughfares), does not apply to GPS technology. After concluding that Knotts does not apply, the decision constructs a framework for analyzing GPS monitoring based on an unsound constitutional foundation.
Make no mistake, concerns over privacy in the information era may make it appropriate to reconsider the principles used for determining whether law enforcement activity constitutes a search within the Fourth Amendment’s meaning. The dissenting opinion cogently makes the point. For now, however, the path for lower courts is clear: the holding of Knotts governs GPS monitoring. The practice of using these devices to monitor movements on public roads falls squarely within the Court’s consistent teaching that people do not have a legitimate expectation of privacy in that which they reveal to third parties or leave open to view by others. See, e.g., Florida v. Riley, 488 U.S. 445, 449-50, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989) (plurality opinion); California v. Greenwood, 486 U.S. 35, 40-41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988); Dow Chem. Co. v. United States, 476 U.S. 227, 238, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986); New York v. Class, 475 U.S. 106, 114, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986); Smith v. Maryland, 442 U.S. 735, 743-44, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979); Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring) (“[0]b-jects, activities, or statements that [a person] exposes to the ‘plain view’ of outsiders are not ‘protected’ because no intention to keep them to himself has been exhibited.”). If the doctrine needs clarifying, tweaking, or an overhaul in light of technologies employed by law enforcement, that additional guidance should come from the Supreme Court. The matter is, as they say, above our pay grade.
I.
The Fourth Amendment to the United States Constitution provides: “The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause____” U.S. Const. amend. IV. With few exceptions, based on “the exigencies of the situation,” a search is unreasonable' — -and therefore unlawful— if not authorized by a search warrant. *277 Mincey v. Arizona, 437 U.S. 385, 393-94, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); see also United States v. Ross, 456 U.S. 798, 809, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) (automobile exception to the warrant requirement). And when a search is unreasonable, the so-called exclusionary rule kicks in to vindicate the Fourth Amendment’s protections by kicking out the unlawfully obtained evidence. See Herring v. United States, 555 U.S. 135, 129 S.Ct. 695, 699, 172 L.Ed.2d 496 (2009).
If there is no search (or seizure), however, then constitutional guarantees do not come into play. And, perhaps counterintuitively, just because law enforcement go looking for some one or some thing does not mean that they have conducted a search within the meaning of the Fourth Amendment.[1] To determine whether government activity constitutes a search, well established doctrine teaches that we ask two questions; only if the answer to both is yes has the government conducted a search. First, we ask whether an individual “by his conduct has exhibited an actual (subjective) expectation of privacy.” Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (quotation marks omitted). The second question, where most of the case-law action takes place, is whether the individual’s expectation of privacy is “objectively reasonable” — that is, whether society is willing to recognize the expectation of privacy as reasonable. Id. The genesis of that two-part framework is the concurring opinion, authored by the second Justice John Marshall Harlan, in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).
In applying the Katz framework in the context of electronic surveillance, the Court has held that people lack a reasonable expectation of privacy in their movements over public thoroughfares from one place to another. That is the holding of Knotts, 460 U.S. 276, 103 S.Ct. 1081; see also United States v. Karo, 468 U.S. 705, 707, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (Knotts reaches information that could have been obtained through visual surveillance); Illinois v. Andreas, 463 U.S. 765, 774, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) (Brennan, J., dissenting) (reading Knotts more broadly for the proposition that a person has no privacy interest in the location of his automobile on public roads). Leroy Knotts was arrested for his part in a methamphetamine operation. To nab Knotts, law enforcement used a combination of visual surveillance and a beeper[2] to *278 zero in on a shipment of chloroform making its way from Minneapolis, Minnesota, to Knotts’s cabin in Shell Lake, Wisconsin. After tracking the vehicle to the cabin, law enforcement procured a search warrant, where they found a fully operational drug lab. Knotts, 460 U.S. at 278-79, 103 S.Ct. 1081. Knotts was arrested and convicted, and the Court’s decision upheld the denial of his motion to suppress the evidence against him. The Court held that a “person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.” Id. at 281, 103 S.Ct. 1081. In reaching its decision, the Court likened the use of a beeper to following an automobile on public streets and highways, which it presupposed did not implicate Fourth Amendment concerns. Therefore, police — who could have maintained visual contact with the shipment — were allowed to augment their faculties with technology, id. at 282, 103 S.Ct. 1081, even though it is more accurate to say they substituted their faculties, for police lost visual contact during the operation, id. at 278, 103 S.Ct. 1081. Yet, nothing about the effectiveness of beepers undermined their constitutionality: “[w]e have never equated police efficiency with constitutionality, and we decline to do so now.” Id. at 284, 103 S.Ct. 1081.
A GPS device works differently than a beeper, but nothing inheres in the technology to take it out of Knotts’s holding. A beeper transmits a signal that a receiver can detect. With GPS technology, the unit itself is a receiver: using a process called trilateration, the unit pieces together the geographical coordinates of its location based on its position relative to several orbiting satellites. Renée McDonald Hutchins, Tied up in Knotts? GPS Technology and the Fourth Amendment, 55 UCLA L. Rev 409, 415-17 (2007) (arguing that the warrant requirement should apply to law enforcement use of GPS tracking technology). When affixed to a vehicle, the GPS unit can either record the vehicle’s movements for later downloading or transmit the information at intervals. To be sure, GPS units are far more accurate than beepers. Compare Karo, 468 U.S. at 708, 104 S.Ct. 3296 (explaining that the beeper in that case was accurate enough for officers to learn that cans of ether were in a commercial storage facility, but not enough to identify the locker in which the cans were stored), with Hutchins, supra, at 420 (ever improving GPS technology can be accurate to within roughly 6.5 feet). Yet, Knotts indicates that the precision of GPS technology does not render a person’s expectation of privacy more reasonable: “Insofar as respondent’s complaint appears to be simply that scientific devices such as the beeper enabled police to be more effective in detecting crime, it simply has no constitutional foundation.” Knotts, 460 U.S. at 284,103 S.Ct. 1081.
II.
The D.C. Circuit’s first ambition in Maynard is to conclude that Knotts does not govern when police engage in GPS monitoring for a prolonged period of time. The dissent goes farther, suggesting that the intent of law enforcement at the time the “events were unfolding,” post, at 292, is what matters. Contra Karo, 468 U.S. at 712, 104 S.Ct. 3296 (“[W]e have never held that potential, as opposed to actual, invasions of privacy constitute searches for purposes of' the Fourth Amendment.”). To reach its conclusion that Knotts does not govern, the D.C. Circuit relies on dicta from Knotts in which the Supreme Court suggested that unspecified legal principles, different from the ones the Court had just announced, might apply to either mass surveillance or prolonged surveillance.
*279 Specifically, the defendant in Knotts had argued to the Court that removing beepers from Fourth Amendment scrutiny would clear the way for “twenty-four hour surveillance of any citizen of this country.... [A]ny person or residence could be monitored at any time and for any length of time.” See Brief for Respondent at 9, Knotts, 460 U.S. 276, 103 S.Ct. 1081. (At the time the concern was science fiction; now it is all too possible.) The Supreme Court addressed the concern by intimating that it might reconsider its doctrine in the future. “[I]f such dragnet type law enforcement practices as respondent envisions should eventually occur, there will be time enough to determine whether different constitutional principles may be applicable.” Knotts, 460 U.S. at 284, 103 S.Ct. 1081.[3]
Precisely what the Court was reserving in Knotts is hardly clear. Ambiguity arises because the phrase “twenty-four surveillance” is commonly used as shorthand for around-the-clock surveillance over a prolonged time period. Yet, Rnotts’s concern seems to have been that any person, perhaps every person, could be monitored by the government. That concern seems better characterized as mass surveillance and the concern was acknowledged by the Court’s use of the word “dragnet.” Thus, it appears that the Court recognized both concerns, but whether one or both must be present to trigger the reservation in Knotts is not self-evident. Compare Maynard, 615 F.3d at 556-57 (Knotts reserved the issue of prolonged 24-hour surveillance), with Garda, 474 F.3d at 998 (reserving the issue of mass surveillance). Likewise, the suggestion that different constitutional principles could apply is vague. It could mean that Katz may not be the right way to look at the question of electronic monitoring, or it could mean that additional limiting principles might cabin Knotts.
Regardless of the precise contours of Knotts’s reservation, however, I do not believe it invests lower courts with the authority to depart from the case’s holding. The decision in Knotts cannot fairly be read to imply that a court could determine that the use of dragnet law enforcement tactics — whatever that means— amounts to a search under the Fourth Amendment. Rather, Knotts says that different “constitutional principles” could apply to the entire question of whether and when electronic monitoring constitutes a search. The case holds that a person does not have a reasonable expectation of privacy in her movements over public thoroughfares from one place to another. It is difficult to see — based on the case law we have — how aggregating a nullity over a longer time period, or for more trips, yields an expectation of privacy. Thus, I respectfully disagree with the dissent’s conclusion that the case falls outside the scope of the Supreme Court’s rule that only it can overrule one of its precedents. See State Oil Co. v. Khan, 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). The holding in Knotts is that a person has no expectation of privacy in movements from one place to another on public roads; by its terms, the holding is indifferent to *280 the technology used to observe those movements.
III.
The fact that Knotts controls should end the inquiry. Nonetheless, it is worth noting that Maynard’s reasoning does not fit comfortably with the Supreme Court’s Fourth Amendment search cases.
Having freed itself from Knotts, the Maynard decision falls back on the more general framework announced by Justice Harlan’s seminal concurrence in Katz: a person has a legitimate expectation of privacy, and hence the Fourth Amendment’s strictures apply, when a person’s subjective expectation of privacy is objectively reasonable. 389 U.S. at 361, 88 S.Ct. 507. The Maynard Court ruled that the defendant’s expectation of privacy was objectively reasonable in that case because (1) his movements during the course of a month were not actually exposed to the public, as the probability that someone would observe the movements for a month was “effectively nil,” Maynard, 615 F.3d at 560, and (2) the defendant’s movements were not constructively exposed either because the picture that law enforcement could obtain from one-month-long surveillance revealed a whole that was greater than the sum of its parts, id. at 561-62 (“Repeated visits to a church, a gym, a bar, or a boolde tell a story not told by any single visit, as does one’s not visiting any of these places over the course of a month.”).
Neither of Maynard’s twin bases for ruling that the defendant had an objectively reasonable expectation of privacy is doctrinally sound — or all that workable as a practical matter.
A.
To make the argument that the defendant’s movements were not “actually exposed” to the public, Maynard starts from the premise that “[i]n considering whether something is ‘exposed’ to the public as that term was used in Katz we ask not what another person can physically and may lawfully do but rather what a reasonable person expects another might actually do.” 615 F.3d at 559. The probabilities premise is flawed. A person’s expectations about actual likelihoods may indicate whether a person had a subjective expectation of privacy, but those expectations are not talismanic on the question of whether a person’s expectation of privacy is objectively reasonable. Rakas v. Illinois, 439 U.S. 128, 143 n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (a “legitimate” expectation of privacy “means more than a subjective expectation of not being discovered”). Take United States v. Jacobsen, 466 U.S. 109, 122 & n. 22, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), which held that federal agents did not conduct a search when they conducted a field test on cocaine discovered by a shipping company. There, the Court said, “The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of authorities.” 466 U.S. at 122, 104 S.Ct. 1652. A strictly probabilities-based test for exposure is likewise hard to square with cases like United States v. White, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). In White, a plurality of the Court ruled that Katz left undisturbed the teaching in Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) that the Fourth Amendment affords no protection to “a wrongdoer’s misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.” White, 401 U.S. at 748-49, 91 S.Ct. 1122. Yet, how many people expect that their associates are *281 wearing wires when they come to visit? The act is, I imagine, as unexpected as it is unfriendly.
To support its conception of actual exposure, Maynard focuses on Riley, the case in which the Court held that police surveillance of a greenhouse within a home’s curtilage, from an altitude of 400 feet, did not infringe on a defendant’s reasonable expectation of privacy. In reaching the conclusion, both the plurality and the concurrence noted that helicopter traffic was relatively routine. See Riley, 488 U.S. at 450, 453, 109 S.Ct. 693. It overstates the case, however, to equate the Court’s observations about the routineness of air travel — in the context of law enforcement activity directed toward the home — as enacting a probability-based prism for evaluating whether a person’s expectation of privacy is reasonable. Nor does the case support the D.C. Circuit’s apparent conclusion that the reasonableness inquiry turns on the likelihood that a “stranger” would make the observations in question. See Maynard, 615 F.3d at 560.
After all, even knowing that air travel is routine, no one actually expects that someone might hover over his house: just as proximate cause represents a policy judgment about when an outcome should be attributed to a person’s actions, the reasonable-expectation-of-privacy framework from Katz represents a policy judgment (albeit by reference to society) about when the law will honor someone’s prediction or hope that no one is watching. One might reasonably ask whether judges are the best actors to make that determination. See Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 70 (1998) (observing that “[jjudges and warrants are the heavies, not the heroes, of the [Fourth Amendment] story”). Nonetheless, the Supreme Court’s case law does not indicate to me that the society will put its imprimatur on an expectation of privacy in publicly revealed information simply because the person thinks no one is watching. See also Greenwood, 486 U.S. at 39-40, 108 S.Ct. 1625 (“It may well be that respondents did not expect that the contents of their garbage bags would become known to the police or other members of the public. An expectation of privacy does not give rise to Fourth Amendment protection, however, unless society is prepared to accept that expectation as objectively reasonable.”); Smith, 442 U.S. at 743^4, 99 S.Ct. 2577 (noting that even if the petitioner did expect that the phone company would keep his calling information private, the expectation would not be reasonable because “a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties”).
So, Maynard’s gloss that someone’s information has not been “actually” exposed unless it was reasonably likely someone would gather the information and aggregate it — which seems like another flavor of “constructive” exposure anyway, given that police actually gathered the publicly exposed information — seems untenable. Under the governing legal framework, the point is not that one expects to remain free from observation as a probabilistic matter. The point is that, having become aware of the fact that there are people in public spaces who root through garbage, as in Greenwood, or that people in aircraft might peer down from the sky, as in Riley and California v. Ciraolo, 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), a person is not entitled to expect that he will remain free from observation. Indeed, cases like Riley and Greenwood, and Oliver v. United States, 466 U.S. 170, 177-79, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (no search where police trespass into open fields marked by no-trespassing signs), often prove striking for law students precisely because their intuitions tell them that a *282 person would not expect — as a probabilistic matter — to be subjected to the search technique in question.
Like Riley, the Supreme Court’s limited discussion of probabilities in Bond v. United States, 529 U.S. 334, 120 S.Ct. 1462, 146 L.Ed.2d 365 (2000), and Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), do not provide robust support for the D.C. Circuit’s conception of the Fourth Amendment. In Bond, the Court ruled that a defendant did not expose the contents of his soft luggage to the public, despite the fact that it was vulnerable to “tactile observation” while in an overhead bin, because police manipulation of a bag was significantly more invasive than the casual contact that a traveler expects. 529 U.S. at 338-39, 120 S.Ct. 1462. In Kyllo, the Court relied in part on the fact that the thermal imaging tool that law enforcement used to learn about activities within the home was not in widespread public use.[4] 533 U.S. at 34, 121 S.Ct. 2038 (emphasizing that the sanctity of the home made the analysis relatively easy in that case). Dicta in both cases provide arguable support for Maynard’s gloss on the Fourth Amendment, but the D.C. Circuit galvanizes the dicta and elevates their doctrinal role. In Riley, Bond, and Kyllo, law enforcement were subjecting individuals to an investigative technique in an area where Fourth Amendment concerns apply, or to an effect enjoying Fourth Amendment protections. That feature matters. Although it has become an old saw that the Fourth Amendment protects people, not places, the starting point in the Katz inquiry generally “requires reference to a ‘place,’ ” Katz, 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring), or to an effect, Bond, 529 U.S. at 336, 120 S.Ct. 1462. See also Maryland v. Macon, 472 U.S. 463, 469, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985) (individual had no expectation of privacy in areas of a store where the public was invited to transact business); Segura v. United States, 468 U.S. 796, 820, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) (“Nowhere are expectations of privacy greater than in the home.”). Without a legitimate expectation of privacy, talk of probabilities and routineness never gets off the ground.[5]
In addition to its legal shortcomings, the probabilistic “actual exposure” approach to Fourth Amendment searches is problematic because it is unworkable. How likely is it that a person actually would have followed Cuevas-Perez from Texas to Illinois? To determine if it was so unlikely that the Fourth Amendment applies, we presumably would draw on Knotts and figure out the likelihood that a person would be observed driving for several hours from a city like Minneapolis, Minnesota, to the more remote setting of Shell Lake, Wis *283 consin. Is that less likely than the odds that a person would be observed traveling from Texas to Illinois along major highways? If a court wanted to answer that fraught question, it would ask about the frequency with which people take the different routes, the populations at the endpoints in the journeys, how likely people are to peel off at particular exits, and so forth. The framework would prove impossible for law enforcement to administer ex ante. Kyllo, 533 U.S. at 38-39, 121 S.Ct. 2038 (allowing warrantless thermal imaging so long as no “intimate details” were revealed would be “impractical in application” in part because police could not know in advance whether they were engaged in a search). And it is unlikely that courts would prove particularly good at the task ex post, as they would probably just rely on empirical hunches anyway. Cf. Leonard Mlodinow, The Drunkard’s Walk How Randomness Rules Our Lives 37-40 (2008) (recounting, and explaining the probabilities involved in, a California Supreme Court case that “illustrates] the use and misuse of probability in law”).
The decision in Maynard does not indicate how courts are to decide “actual exposure” arguments, nor does the idea have an obvious limiting principle. Indeed, Maynard’s conception of probabilities might render unconstitutional a great deal of bread-and-butter law enforcement work. Few people would expect that they are being investigated at all, much less for prolonged periods of time, regardless of the technology at issue. Are all prolonged investigations on the constitutional chopping block unless police have probable cause and a warrant? If Maynard aims at preserving traditional law enforcement techniques while addressing legitimate concerns about the government’s ability to use technology to peer into the lives of its citizens, its concept of actual exposure seems to miss the mark.
B.
The other basis for Maynard’s holding that police violated the defendant’s expectation of privacy was its conclusion that the information about the defendant’s movements was not “constructively” exposed to law enforcement. (Perhaps it would have made more sense to say that movements were constructively shielded from view.) The idea is that law enforcement engage in a search when their investigative activity allows them, over the long term, to learn intimate details about a person’s life. The D.C. Circuit likens the notion to a “mosaic” in which law enforcement can obtain a whole picture that is greater than the sum of its parts. Maynard, 615 F.3d at 562.
Constructive exposure is the second of Maynard’s twin pillars, and counsel for Cuevas-Perez invoked the concern at oral argument. The response is straightforward: the fact that law enforcement are able to take information that is revealed publicly and piece together an intimate picture of someone’s life does not raise constitutional concerns under current doctrine. What matters is that the information has been willingly conveyed, not that someone has aggregated it. Perhaps the starkest exemplar of that teaching comes from the Supreme Court’s decision in Greenwood. That is the case in which the Supreme Court held that police do not effect a Fourth Amendment search when they go sifting through a person’s garbage that has been left outside the curtilage of the home. Greenwood, 486 U.S. at 40-41, 108 S.Ct. 1625. As Justice Brennan’s dissent noted, “A single bag of trash testifies eloquently to the eating, reading, and recreational habits of the person who produced it.” Id. at 50, 108 S.Ct. 1625. The information in a bag of trash runs the *284 gamut, from sexual practices to financial information to private thoughts and everything in between. Id. The same concerns are present with the pen registers in Smith. The government, with a list of phone numbers in hand, could learn much about a person’s take-out ordering habits, the frequency of trips to the doctor’s office, and the particulars of familial relations. Of course, nothing half so titillating was revealed by Cuevas-Perez’s journey from Texas to Illinois, but even if intimate facts had been revealed, the argument (and the D.C. Circuit’s decision in Maynard) is difficult to reconcile with cases like Greenwood and Smith.
In fact, other than Smith, which upheld the government’s warrantless use of pen registers, the D.C. Circuit cites scant Supreme Court Fourth Amendment case law in support of its constructive exposure framework. (The opinion suggests that the Court in Smith implicitly recognized the mosaic concern, Maynard, 615 F.3d at 561, but it is too implicit for me to perceive.) Instead, the D.C. Circuit relies principally on a Freedom of Information Act case, in which context the Court ruled that the contents of an FBI rap sheet were exempt from disclosure under the statute’s privacy exemption. Maynard 615 F.3d at 561 (citing United States Dep’t of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 764, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989)). But the case is inapposite, for the FOIA case tells us only when something is private under a statute, not whether a person has an expectation of privacy under the United States Constitution. With respect to FOIA, the Act itself tells us whether a person has an expectation of privacy, based on whether the information may be withheld or must be released. Reporters Comm., 489 U.S. at 772, 109 S.Ct. 1468 (noting that the applicability of the exemption, which allows information constituting an “unwarranted invasion of personal privacy” to be withheld, turns on the purposes of FOIA). It is not obvious why we should look to FOIA to tell us what society expects to remain private for Fourth Amendment purposes.
The Maynard opinion also relies on state supreme court cases which have held that GPS monitoring violates state constitutional guarantees. 615 F.3d at 562. Here, too, reliance is misplaced. Those cases acknowledge that the Supreme Court has interpreted the protections in the U.S. Constitution more narrowly than state courts have interpreted them own constitutions. See People v. Weaver, 12 N.Y.3d 433, 882 N.Y.S.2d 357, 909 N.E.2d 1195, 1202 (2009); State v. Jackson, 150 Wash.2d 251, 76 P.3d 217, 222 (2003); id. at 223-24 (finding “persuasive” the analysis in an Oregon case that squarely conflicts with Knotts’s refusal to consider technological efficiency in evaluating constitutionality).
Moreover, the mosaic approach, like a probabilistic “actual exposure” approach, would prove unworkable. Law enforcement — at some point — would have to stop looking at that which is publicly exposed. But how can one discern the point before the fact? I do not see how, and Maynard does not suggest answers. The case’s reasoning, however, suggests that the government ought to be circumspect in using confidential informants for extended periods of time, engaging in visual surveillance in the same areas in search of drug farms, or infiltrating organized crime or terrorist organizations in an effort to build a case.
Again, however, I believe that Knotts governs. Although it is not as obvious to me as it is to my dissenting colleague where the D.C. Circuit would draw constitutional lines around Cuevas-Perez’s sixty-hour journey, see Maynard, 615 F.3d at 558 (suggesting that its holding would not *285 reach government tracking of a “single journey” by a defendant), I do not find it necessary to ask the question. Nor do I find it necessary to ask whether a reasonable suspicion standard would accommodate the competing constitutional interests at play. Cf. Karo, 468 U.S. at 718 n. 5,104 S.Ct. 3296 (intimating that reasonable suspicion might be sufficient to allow monitoring of a beeper in the home).
IV.
New technologies and their potential to threaten privacy may indeed raise Fourth Amendment hackles. They certainly raise valid policy questions. (Think of the ability of powerful computers to amass tremendous stores of information on the public.) If we were empowered to examine the questions surrounding GPS monitoring, I would look to principles different from those relied upon in Maynard — ones that more obviously speak to the technology at issue here without suggesting the invalidity of a host of traditional, legitimate law enforcement techniques. There may be a colorable argument, for instance, that the use of GPS technology to engage in long-term tracking is analogous to general warrants that the Fourth Amendment was designed to curtail, because of the technology’s potential to be used arbitrarily or because it may alter the relationship between citizen and government in a way that is inimical to democratic society. See Illinois v. Krull, 480 U.S. 340, 362, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987) (O’Con-nor, J., dissenting) (Fourth Amendment was designed to curtail indiscriminate searches); Wolf v. People of the State of Colorado, 338 U.S. 25, 27, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (Frankfurter, J.) (“The security of one’s privacy against arbitrary intrusion by the police — which is at the core of the Fourth Amendment — is basic to a free society.”); Thomas Y. Davies, Recovering the Original Fourth Amendment, 98 Mich. L.Rbv. 547, 552, 657 (1999) (teaching that general warrants were “reviled as a source of arbitrary power” and explaining that the Founders “saw no need for a constitutional standard to regulate the warrantless officer because they did not perceive the warrantless officer as being capable of posing a significant threat to the security of person or house”); id. at 668 (at the time of the founding there was no pressing need to regulate warrantless government authority in part because the authority of officers was limited); see also United States v. White, 401 U.S. 745, 762, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971) (Douglas, J., dissenting) (“Monitoring, if prevalent, ... kills free discourse____”). On this view, the constitutional ill of prolonged or mass use of GPS technology would not necessarily be based on the information acquired by the device but on the fact of the government’s gaze.
Of course, the Supreme Court just last term reminded us that “[t]he judiciary risks error by elaborating too fully on the Fourth Amendment implications of emerging technology before its role in society has become clear.” City of Ontario v. Quon, -U.S.-, 130 S.Ct. 2619, 2629, 177 L.Ed.2d 216 (2010). In light of Knotts’s holding and Quon’s admonition, it strikes me not so much as insufficiently circumspect as simply beyond our mandate to conclude that what is permissible when accomplished with a beeper is impermissible when accomplished with a GPS unit. I agree with the dissent, however, that nothing would preclude Congress from taking the important questions implicated by GPS technology and imposing answers. See also Orin S. Kerr, The Fourth Amendment and New Technologies: Constitutional Myths and the Case for Caution, 102 Mich. L.Rev. 801, 805-06 (2004) (arguing that Congress should be the primary driver of privacy protections when technology “is in *286 flux”). Indeed, the unsettled, evolving expectations in this realm, combined with the fast pace of technological change, may make the legislature the branch of government that is best suited, and best situated, to act.

. Courts look to doctrine rather than the ordinary meaning of the term "search” to figure out if law enforcement have conducted a search. That may seem odd, but it (ultimately) makes sense. In the founding era, the word meant much the same as it means now. To search meant "[t]o look over or through for the purpose of finding something; to explore; to examine by inspection; as, to search the house for a book; to search the wood for a thief.” Kyllo v. United States, 533 U.S. 27, 33 n. 1, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) (quoting N. Webster, An American Dictionary of the English Language 66 (1828) (reprint 6th ed.1989)). As the majority noted in Kyllo, defining search by reference to doctrine may represent an effort to preserve the presumption that law enforcement obtain a warrant prior to conducting searches. However, applying doctrine to define search has little practical effect — other than frustrating conversations with laypersons. Even if courts looked to the ordinary meaning of the word search to define it, courts would still have to figure out what circumstances demand a search warrant. The Constitution is silent on that point, so exegesis would leave dictionaries dusty and bring us right back to doctrine.

. A beeper is a radio transmitter that "emits periodic signals that can be picked up by a receiver.” Knotts, 460 U.S. at 277, 103 S.Ct. 1081. Police had installed a beeper in a container of chloroform before the chloroform was purchased by one of Khotts’s associates.

. Before and after Knotts, individual justices have concluded in essence that the time has come, that the doctrine as implemented inadequately protects privacy in light of technological advances. E.g., Dow Chem., 476 U.S. at 240, 106 S.Ct. 1819 (Powell, J., concurring in part and dissenting in part) (predicting that the majority's approach would "permit the gradual decay [of Fourth Amendment rights] as technology advances”); see also Olmstead v. United States, 277 U.S. 438, 473, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J„ dissenting) (observing that technological innovation permits the government to learn what is “whispered in the closet” far more effectively than by means of torture).

. That point would not help Cuevas-Perez, as GPS technology is easily obtainable and appears to be in widespread use. A simple Internet search is nothing less than revelatory. The Orion ST-811 used in this case is similar to publicly available counterparts in terms of one's ability to keep tabs on someone in close to real time, for extended periods of time.

. Maynard does point to a handful of state statutes limiting the use of GPS devices, 615 F.3d at 564, and positive law may give rise to a legitimate expectation of privacy, e.g., Oliver, 466 U.S. at 189, 104 S.Ct. 1735 (Marshall, J., dissenting). The D.C. Circuit, however, was correct to evince caution in relying on these state laws as supporting a societal understanding, both because their number is relatively small and because the case law does not indicate that such statutes will automatically lead to constitutionalized interests in privacy. See Jacobsen, 466 U.S. at 122 n. 22, 104 S.Ct. 1652 (quoting Rakas, 439 U.S. at 143-44 n. 12, 99 S.Ct. 421); Greenwood, 486 U.S. at 55 n. 4, 108 S.Ct. 1625 (Brennan, J., dissenting) (suggesting that a statute may reinforce a right to privacy but that the statute and right are not inextricably linked).