2023 PA Super 189

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ZAHIR DESHON WATKINS | : | |
| | : | |
| Appellant | : | No. 2209 EDA 2021 |

Appeal from the Judgment of Sentence Entered September 27, 2021
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0003701-2020

BEFORE: PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.[*]

DISSENTING OPINION BY OLSON, J.: **FILED SEPTEMBER 29, 2023**

I respectfully dissent from the learned Majority, as I find Appellant, Zahir Deshon Watkins, maintained a subjective expectation of privacy in the whole of his movements *via* his vehicle that society would recognize as reasonable. As such, the unfettered accessing, reviewing, and monitoring of historical License Plate Reader ("LPR") data, and receiving real-time image capture alerts that disclosed the location of Appellant's vehicle on a particular date at a particular time, constituted a search for purposes of the Fourth Amendment of the United States Constitution. Therefore, Officer Brian Bielecki ("Officer Bielecki") needed to obtain a search warrant before accessing this historical LPR data and arranging to receive alerts of real-time image captures that chronicled the whole of Appellant's movements over the course of several

---

[*] Former Justice specially assigned to the Superior Court.

months. For these reasons, I would vacate Appellant's September 27, 2021 judgment of sentence and reverse the August 5, 2021 trial court order denying Appellant's *omnibus* pre-trial motion to suppress evidence.

In its Opinion, the Majority sets forth a summary of the factual and procedural history. **See** Majority at *2-*5. I incorporate those portions of the Majority opinion herein.

Appellant raises the following issues for our review:

[1.] Did the trial court err in denying Appellant's [*omnibus*] motion [] where the use of a [LPR system] to track Appellant's movements constitutes a search?

[2.] Did the trial court err in denying Appellant's [*omnibus*] motion [] where the search of Appellant's vehicle was not justified as a reasonable inventory search?

Appellant's Brief at 9 (extraneous capitalization omitted).

Appellant's issues challenge the trial court's denial of his *omnibus* motion, which sought to suppress physical evidence uncovered during a search of Appellant's vehicle.[1] An appellate court's standard and scope of

---

[1] In the case *sub judice*, the precise status of the vehicle and Appellant's relationship to the vehicle are unknown. The record suggests that the vehicle Appellant operated on June 17, 2020, was a rental vehicle. **See** N.T., 8/4/21, at 49, 63 (stating, "I [(Officer Bielecki)] ran the [vehicle] registration, and it didn't come back registered to anybody. I believe it was like a rental type vehicle."). Typically, an operator of a rental vehicle does not have standing to challenge the constitutionality of a vehicle search when he or she is not an authorized driver or where the rental agreement has expired. **Commonwealth v. Jones**, 874 A.2d 108, 119-120 (Pa. Super. 2005). Here, however, Appellant provided the police officers with a valid driver's license and insurance information, and the police officers did not identify any

- 2 -

review governing a challenge to the denial of a suppression motion is well-settled.

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. [When] the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the [suppression] court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on the appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the [suppression] court are subject to plenary review.
>
> ***Commonwealth v. Hoppert***, 39 A.3d 358, 361-[3]62 (Pa. Super. 2012)[, *appeal denied*, 57 A.3d 68 (Pa. 2012)].
>
> Moreover, "appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress." ***Commonwealth v. Stilo***, 138 A.3d 33, 35-36 (Pa. Super. 2016)[.]

---

problems with the vehicle's registration and accepted Appellant as a valid driver of the vehicle. ***Id.*** at 62-63. Moreover, at the time of the suppression hearing, the Commonwealth did not raise an issue regarding Appellant's standing to challenge the constitutionality of the vehicle search. Thus, under the circumstances of the case *sub judice*, there is nothing to suggest that Appellant did not have standing to challenge the constitutionality of the search. ***See Commonwealth v. Govens***, 632 A.2d 1316, 1319-1320 (Pa. Super. 1993), *appeal denied*, 652 A.2d 1321 (Pa. 1994).

*Commonwealth v. Wright*, 224 A.3d 1104, 1108 (Pa. Super. 2019) (original

brackets and ellipsis omitted), *appeal denied*, 237 A.3d 393 (Pa. 2020).

At the conclusion of the suppression hearing, the trial court, from the

bench, made the following findings of fact:

> [On June 17, 2020, Officers Bielecki, Mathew, and Farnan], all of
> the Bensalem Township [P]olice [Department], were conducting
> an undercover investigation and traveling in an unmarked vehicle
> in Bensalem [Township]. At the very least[,] Officers Bielecki and
> Mathew were both part of Bensalem [Township Police
> Department's] special investigation unit that involved narcotics
> interdiction as a prime focus of that particular unit. And, again,
> at least those two [police officers] were trained in that field and
> very experienced in dealing with and conducting arrests of
> narcotics traffickers.
>
> While conducting an unrelated investigation, Officer Bielecki
> received [a] LPR [system] alert involving a [vehicle], which was
> the subject of information received previously from [Officer
> Mergiotti,] regarding trafficking drugs in Bensalem [Township] by
> a man with dreadlocks.
>
> The [police] officers decided, after having received that alert, to
> locate the [vehicle. Ultimately, the police officers] did locate that
> vehicle somewhere in the area of a [nearby] elementary school.
>
> Both Officers Mathew and Bielecki testified that they observed the
> [vehicle] swerve left, both tires crossing the center line, then
> [swerve] right, to or across the fog lane, and then [swerve] back
> again to the center lane. While it was not originally their intent to
> stop the vehicle, they decided that for public protection purposes
> and, of course, because they [] observed traffic violations, that
> they would, in fact, stop that vehicle. As Officer Bielecki put it,
> [the vehicle] was all over the highway.
>
> Now, the [LPR] device, which triggered this series of events is
> essentially an instrument that records [] license plates [on
> vehicles passing the device], stores that information[,] and can
> also alert [police] officers to violations, such as suspended
> registration, [suspended drivers] licenses, or outstanding
> warrants. Information is stored and can be retrieved, and in this
> particular case, the LPR [] recorded this particular vehicle passing

[the] Bensalem [Township] high school on numerous occasions. And then on the evening of [June 17, 2020,] the alert[] triggered this series of events.

Shortly after activating the [undercover police vehicle's] lights, just short of the Philadelphia-Bensalem [Township] border, the vehicle, ultimately identified as being driven by [Appellant], stopped and then was approached by Officer Mathew on the driver's [side] door[.] Officer Bielecki [approached the vehicle] on the passenger side. Officer Mathew spoke with [Appellant,] the driver, and when asked[,] told [Appellant] why he had been stopped[. Officer Mathew] obtained [Appellant's driver's] license, insurance [card,] and other relevant information [from Appellant.]

At that same time, [Officer Bielecki] observed numerous air fresheners hanging from the rear-view mirror [of the vehicle and] smelled a strong aroma coming from those air fresheners. He knew from his training in narcotics interdiction that air fresheners, such as these, were common[ly used] to mask smells of controlled substances, such as marijuana.

Now, Officer Mathew provided no testimony indicating any observations of intoxication[, and as such, the trial] court takes from that that there were no such signs. Officer Mathew then returned to his [undercover police vehicle] to [access] his vehicular computer [to retrieve] information [concerning] the driver and the vehicle.

Simultaneously, Officer Bielecki, having spoken to the passenger, and after having smelled marijuana, asked [the passenger] about that smell. [The passenger] acknowledged having a bowl for smoking marijuana [in her purse].

Officer Bielecki returned to the [undercover police] vehicle[ and] provided this information to Officer Mathew. Officer Mathew and [Officer] Bielecki then returned to [Appellant's] vehicle[. Officer] Mathew [returned to the vehicle] on the driver's side, [and Officer] Bielecki [returned to the vehicle] on the passenger side[. Officers] Mathew and Bielecki intended to separate] the two persons so they could be questioned [separately] to make sure their stories [were not fabricated].

This time when he approached the vehicle window, Officer Mathew smelled marijuana and asked [Appellant] to exit the [vehicle.] Body [camera] video, which was presented as [Commonwealth Exhibit] CS-1, was shown[,] essentially portraying what occurred

in the attempt to get – both by orally convincing him to and then physically – to get [Appellant] removed from the vehicle. It does show the actions taken by [the] police [officers] and the restraint used by them when [Appellant] refused to get out of the vehicle, while repeatedly saying [he did] not consent to a search of the [vehicle. The trial] court certainly notes that [Appellant] did not, in fact, consent to the search of his [vehicle].

Thereafter, [Appellant] was placed in handcuffs. The [] passenger was removed [from the vehicle.] The video clearly showed numerous vehicles passing on the highway [and] other persons [in the vicinity of the traffic stop]. Ultimately[,] four to five [additional] police officers [arrived on scene]. The vehicle was secured in that no one, including the driver or [the] passenger, had access to the vehicle.

At that time, Officer Mathew and [Officer] Bielecki determined that they were going to have the vehicle impounded and a search warrant obtained. With that in mind, and pursuant to Bensalem [Township Police Department] policy, Officer Bielecki then entered the vehicle and conducted an inventory search[. The search included] looking in[] the [vehicle's] door [compartments], wherein a wallet was found, picking up a pocketbook, looking in the [vehicle's] center console, [looking in] the [vehicle's] glove box, [] looking in [] the trunk of the vehicle, where he located an open box, and [looking in] the back passenger side [area] of the vehicle, wherein he [] located a backpack, which he [unzipped] and peered inside.

The vehicle was secured. The tow truck was ordered. Because this vehicle was on a highway, two-lane roadway, with little shoulder, heavily traveled, it was certainly determined that the vehicle needed to be towed from the scene. The [police] officers [] determined that they had probable cause and intended to secure a [search] warrant.

N.T., 8/5/21, at 85-90 (extraneous capitalization omitted).

Appellant's first issue, which I find dispositive in the case *sub judice*, challenges the trial court's conclusion that the collection and use of historical LPR data to track and, ultimately, to locate Appellant's vehicle did not constitute a search subject to the protections of the Fourth Amendment of the

United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.[2]  Appellant's Brief at 18.  Relying on the United State Supreme Court's decision in **United States v. Jones**, 565 U.S. 400 (2012), Appellant asserts,

> it is not the license plate itself but the individual's right to move freely about this country without being tracked electronically, which gives rise to the expectation of privacy, not the letters and numbers contained on a metal plate.  Appellant does not maintain that he has a privacy interest in his license plate number.  He does[,] however[,] have a reasonable expectation of privacy in his daily movements and in being able to drive around in his [vehicle] without being followed.

Appellant's Brief at 14-15.  Appellant contends that the LPR data "was used to track [his] movements and to ultimately follow him and surveil him in hopes

---

[2] The Commonwealth asks this Court to find Appellant waived his first issue because Appellant's Rule 1925(b) statement did not mention use of LPR data but, rather, asserted that the use of "a **GPS tracking device** to monitor Appellant's vehicle's movement on a public street was a search within the meaning of the Fourth Amendment."  Commonwealth's Brief at 8-9 (emphasis added); **see also** Appellant's Rule 1925(b) Statement, 11/15/21, at ¶4.  The trial court, however, understood that Appellant asserted that the collection and use of the LPR data to monitor his movements qualified as a search under the Fourth Amendment.  Trial Court Opinion, 12/16/21, at 8-9 (stating that, Appellant "alleges the [LPR data] used to monitor his vehicle movement is equivalent to a GPS tracking device, the use of which [] constituted a search within the meaning of the Fourth Amendment").  Appellant's Rule 1925(b) statement did not impede the trial court's analysis of this issue and, thus, I do not find waiver.  **Commonwealth v. Reeves**, 907 A.2d 1, 2 (Pa. Super. 2006) (stating that, "[w]hen an appellant fails adequately to identify in a concise manner the issues sought to be pursued on appeal" and "the trial court is impeded in its preparation of a legal analysis which is pertinent to those issues[,]" the issue may be found to have been waived).

that he would be caught in the commission of a crime." *Id.* at 15. Appellant

argues,

> [the] months of surveillance and monitoring of Appellant was accomplished by a[ police] officer merely entering his license [plate] number into [the LPR] system without any oversight, safeguards, or minimum level of required suspicion, let alone judicial review. In fact, the monitoring herein continued for months based on stale, hearsay information.

*Id.* Appellant further contends,

> [h]e had every reason to believe that he was permitted to drive his vehicle without being monitored and without the Bensalem Township Police Department being notified of his movements. It is entirely reasonable for a person living in the United States of America to drive his [vehicle] without being tracked and followed.

*Id.* at 17. Appellant avers that because he "had an expectation of privacy in

the movement of his vehicle, which society recognizes as reasonable[,] the

extensive, electronic tracking and monitoring of his movements constitutes a

search." *Id.* at 18. Appellant contends that because the Commonwealth could

not, or did not, demonstrate "probable cause to conduct this search, the

search was conducted in violation of both the United States Constitution and

the enhanced protections of the Pennsylvania Constitution." *Id.*

In denying Appellant's *omnibus* motion, the trial court, on the issue of

whether use of the LPR data constituted an illegal search, stated,

> As to the [LPR], while I find them personally pervasive, intrusive[,] and concerning regarding the privacy of the citizens of this nation, nothing has been presented [at the suppression hearing], nor am I aware of anything that makes the use of the LPR devices unconstitutional, and that portion of the [*omnibus*] motion is denied.

N.T., 8/5/21, at 91.  The trial court further explained,

> In this case, there is no expectation of privacy in a license plate, as they are often scanned throughout the normal course of traffic [monitoring].  Further, [a] LPR scans and gathers license plate information with no physical intrusion onto the driver['s] property.  Lastly, no caselaw in Pennsylvania equate[s a] LPR with a [global positioning system ("GPS")] tracking device because this is an issue of first impression.  While [the trial c]ourt finds the practice of reading and compiling license plate information troubling, it determined that the facts in this case are insufficient to establish the use of [a] LPR as the equivalent of physically placing a GPS device on a [vehicle].  Therefore, because [the trial c]ourt did not find that the utilization of [a] LPR constitutes a search under the Fourth Amendment, [the trial c]ourt did not err in denying Appellant's [*omnibus* motion].

Trial Court Opinion, 12/16/21, at 9.

The Majority finds that "the trial court properly denied Appellant's [*omnibus*] motion to suppress evidence derived from the warrantless search of the LPR database."  Majority at *13.  The Majority reasons that "[b]ecause the purpose of a license plate is to provide public information and is in plain view on a vehicle, Appellant does not have a reasonable expectation of privacy in his movements captured by the LPR system."  *Id.* at *10  For the reasons expressed herein, I cannot agree.  I believe that the Majority conflates the well-established premise that a driver lacks privacy in his or her license plate, and, thus, in a single image of the license plate, with the broader and more complex question of whether a driver maintains an expectation of privacy in a compilation of license plate images and locational alerts that detail vehicular movements and facilitate the location and tracking of a targeted vehicle over time.

As George Orwell so aptly penned in June 1949,

*There was of course no way of knowing whether you were being watched at any given moment. How often, or on what system, the Thought Police plugged in on any individual wire was guesswork. It was even conceivable that they watched everybody all the time.*

- George Orwell, *Nineteen Eighty-Four* (also published as *1984*).

The question we confront in the case *sub judice* is one of first impression - whether to apply the protections afforded by the Fourth Amendment of the United States Constitution in a novel context – the ability to chronicle a vehicle's past movements, and receive alerts of real-time movements, through a compiled record of the vehicle's license plate, as captured by LPRs and stored in a searchable database.[3] Because this issue

_____

[3] To advocate a separate and distinct claim based upon a provision of the Pennsylvania Constitution, such as Article I, Section 8, a litigant must set forth certain factors and analyze those factors in his or her appellate brief. **See Commonwealth v. Edmunds**, 586 A.2d 887, 895 (Pa. 1991). A litigant must, at a minimum, brief and analyze the following four factors: (1) the text of the Pennsylvania constitutional provision; (2) the history of the provision, including any appliable caselaw; (3) any pertinent related caselaw from other states; and (4) any policy consideration, including unique issues of state and local concern and applicability within modern Pennsylvania jurisprudence. **Id.** Because Appellant in the case *sub judice* did not undertake an independent analysis in his appellate brief as to whether Article I, Section 8 of the Pennsylvania Constitution provided him with greater protection than the Fourth Amendment of the United States Constitution, I shall address Appellant's claim as one which asserts that he is entitled to the same protections under both the state and federal constitutions for purpose of the instant appeal. **See Commonwealth v. Pacheco**, 227 A.3d 358, 366 n.8 (Pa. Super. 2020), *aff'd*, 263 A.3d 626 (Pa. 2021). Therefore, I consider Appellant's first issue solely under the protections of the Fourth Amendment of the United States Constitution.

presents a question of law, our standard of review is *de novo*. **Pacheco**, 227 A.3d at 366.

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, protects a person from unlawful searches and seizures.[4]  The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.[5]

> To prevail on a suppression motion implicating the Fourth Amendment, a defendant must demonstrate a legitimate expectation of privacy in the area searched or effects seized, and such expectation cannot be established where a defendant []

---

[4] A search occurs when the Government "obtains information by physically intruding on a constitutionally protected area" or infringes on an expectation of privacy "that society is prepared to recognize as reasonable[.]" **Carpenter v. United States**, 138 S.Ct. 2206, 2213 (2018); **see also Commonwealth v. Dunkins**, 263 A.3d 247, 265 (Pa. 2021) (Wecht, J. concurring and dissenting), *cert. denied*, 142 S.Ct. 1679 (2022).

[5] Similarly, Article I, Section 8 of the Pennsylvania Constitution provides,

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA Const. art. I, § 8.

meaningfully abdicated his control, ownership[,] or possessory interest.

**Dunkins**, 263 A.3d at 254.  It is well-established that,

An expectation of privacy is present when the individual, by his[, or her,] conduct, exhibits an actual (subjective) expectation of privacy and that the subjective expectation is one that society is prepared to recognize as reasonable.  The constitutional legitimacy of an expectation of privacy is not dependent on the subjective intent of the individual asserting the right but on whether the expectation is reasonable in light of all the surrounding circumstances.  Additionally, a determination of whether an expectation of privacy is legitimate or reasonable entails a balancing of interests.

**Commonwealth v. Brundidge**, 620 A.2d 1115, 1118 (Pa. 1993) (citations and quotation marks omitted); **see also Commonwealth v. Burton**, 973 A.2d 428, 435 (Pa. Super. 2009) (*en banc*).  "When an individual seeks to preserve something as private, and his[, or her,] expectation of privacy is one that society is prepared to recognize as reasonable, [courts] have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause."  **Carpenter**, 138 S.Ct. at 2213 (citation and original quotation marks omitted); **see also Dunkins**, 263 A.3d at 265.

With these constitutional principles in mind, I turn to whether Appellant maintained an expectation of privacy in the movement of his vehicle free from electronic monitoring, imaging of his license plate, and the use of that retained

data to chronicle Appellant's highway usage by law enforcement.[6]  I begin with an explanation of LPRs and how they operate, generally, within the context of law enforcement.  The United States District Court for the Western District of Pennsylvania recently provided the following explanation of LPRs, which I find informative:

> [LPR] systems combine high-speed cameras and sophisticated software to capture and convert license plate images into data that can be compared with information in other databases. Cameras often are placed in fixed locations and automatically[,] and without direct human control[,] locate, focus on, and photograph license plates and vehicles that come within range of the device.  [LPRs] then convert the license plate number into a computer-readable format, uploading the number, an image of the license plate, and the date and time the photograph was taken into a searchable database.

*United States v. Bowers*, 2021 WL 4775977, at *2 (W.D. Pa. filed Oct. 11, 2021) (slip copy).  At the suppression hearing in the case *sub judice*, Officer Bielecki similarly described LPRs as:

> [LPRs] are license plate readers that are either affixed to vehicles, police vehicles[, or are] affixed to [vehicles operated by] repossession companies, like towing companies[.  The LPR] will read a license plate when it goes through the – whether it's a stationary [LPR or one attached to a vehicle], it will read [the license plate] as it passes through, or it will pass by a police [vehicle] or the repossession [vehicle], and then it will compile

---

[6] In analyzing the constitutional implications of LPR technology, I am ever-mindful that the "central aim of the Framers [of the Fourth Amendment] was 'to place obstacles in the way of a too permeating police surveillance.'" *Carpenter*, 138 S.Ct. at 2214, *quoting* *United States v. Di Re*, 332 U.S. 581, 595 (1948).  "A person does not surrender **all** Fourth Amendment protection by venturing into the public sphere." *Carpenter*, 138 S.Ct. at 2217 (emphasis added).

that [information] into a system and it will give the location of where that read happened.

In police vehicles[,] it will [state] whether or not the [vehicle] registration is current. I believe it even [states] if it is a registered owner[ or] if [the driver license is] suspended. It would say if the vehicle was stolen or not. Things of that nature would be learned through [the information provided].

. . . It's like an infrared camera that would capture a still shot of the vehicle [license plate] as it passed, whether it [was] a stationary unit or a patrol [vehicle] that was driving down the road and [had a LPR] affixed to the rear or front of [the vehicle], as well as those [repossession vehicles].

N.T., 8/4/21, at 17-18.

A survey of pertinent Fourth Amendment jurisprudence leads me to conclude that Appellant possessed the requisite expectation of privacy in his historical LPR data to establish that a search has occurred in this case and that any collection and use of such data by law enforcement over time required a warrant. I begin with *New York v. Class*, 475 U.S. 106 (1986), where the United States Supreme Court considered whether observation of a vehicle's vehicle identification number ("VIN") in plain view constituted a "search." *Class*, 475 U.S. at 111-114. The *Class* Court held that "it is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile." *Id.* at 114. The *Class* Court explained that the VIN's "in-plain-view" visibility requirement mandated by law makes the VIN analogous to the exterior of the car. *Id.* Like the exterior of a car, because the VIN is "thrust into [the] public eye" for

all to see, observation of the VIN by law enforcement or the government does not constitute a search. **Id.**

Similarly, because a license plate is attached to the exterior of a vehicle and is required to be in plain view, for all to see, comparable to a VIN, I concur with the Majority that Appellant, in the case *sub judice*, does not maintain an expectation of privacy in the license plate itself. **See** Majority at *12 (stating, "Appellant clearly did not maintain an expectation of privacy for the license plate number"). Consequently, the capture of a single image depicting the license plate, and the information attached thereto, such as the date and time the image was captured or the location of the vehicle at the moment the image was captured, does not constitute a "search" for purposes of the Fourth Amendment.[7] **Id.** Our inquiry, for purpose of the instant appeal, however, requires us to examine further whether law enforcement access to a compilation of LPR images and data that chronicles the movement of a vehicle over a period of time, and that can be searched and reviewed for purposes of tracking and locating a vehicle, constitutes a search.[8]

---

[7] This principle holds true, for example, when a LPR captures a single image of a license plate on a public toll roadway, where the information is then used to administer usage charges, such as in the case of a vehicle using the Pennsylvania Turnpike.

[8] Not only does the nature of Appellant's claim compel further inquiry, the LPR technology utilized in the case *sub judice* purports to combine license plate imaging capabilities with analytical tools to produce actionable intelligence. Hence, whether the use of this emerging technology triggers Fourth Amendment protections strikes me as a worthy subject of in-depth judicial exploration.

Just as technology has advanced over the past several decades, the caselaw surrounding the privacy protections of the Fourth Amendment continues to evolve. In 1983, the United State Supreme Court, in *United States v. Knotts*, 460 U.S. 276 (1983), considered whether law enforcement's use of a "beeper" (radio transmitter), which was placed in a container that was then placed in a vehicle, to track the movement of the vehicle and container and, ultimately, to determine the location of the vehicle, the container, and the defendant, was a search protected by the Fourth Amendment. *Knotts*, 460 U.S. at 278-279. The *Knotts* Court stated that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his[, or her,] movements from one place to another" because that person voluntarily conveyed this information to anyone who wanted to observe it. *Id.* at 281-282. The High Court reasoned that "[n]othing in the Fourth Amendment prohibited the police from augmenting the sensory faculties bestowed upon them at birth [(*i.e.*, visual observation)] with such enhancement as science and technology afforded them in this case." *Id.* at 282. In other words, the police officers were able to enhance their visual tracking of the vehicle transporting the container through use of a "beeper" that was, ultimately, relied upon to confirm that the vehicle and the container arrived at the final destination. *See id.* at 285 (noting that, "because of the failure of the visual surveillance, the beeper enabled the law enforcement officials [] to ascertain the ultimate resting place

- 16 -

of the [container] when they would not have been able to do so had they relied solely on their naked eyes").

Several decades later, as technology advanced from use of a "beeper" to use of a GPS tracking device, the United States Supreme Court in **United States v. Jones**, 565 U.S. 400 (2012) held that "the [g]overnment's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitute[d] a 'search'" for purposes of the Fourth Amendment. **Jones**, 565 U.S. at 404 (footnote omitted). In so holding, the **Jones** Court reasoned that a Fourth Amendment search occurred because the government physically intruded upon a constitutionally protected area, namely the target's vehicle, when the government physically attached a GPS tracking device to the vehicle. **Id.** at 404-405, 413-414 (recognizing that, while visual tracking of an individual traveling in a vehicle on a public throughfare is constitutionally permissible, **achieving the same tracking of a person's vehicular movements through electronic means may be unconstitutional**). In her concurring opinion, Justice Sotomayor reiterated the long-standing principle that, even in the absence of a governmental intrusion upon personal property (such as attaching a GPS tracking device to a vehicle), the **monitoring of a vehicle's movement may still trigger Fourth Amendment protection when it impinges upon an area in which society recognizes a reasonable expectation of privacy**. **See id.** at 414-415 (Sotomayor, J. concurring) (explaining that, "[d]isclosed in [electronic surveillance] data will be trips the indisputably private nature of

which takes little imagination to conjure: trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on" (citation, original quotation marks, and ellipsis omitted)); *see also id.* at 430-431 (Alito, J. concurring in the judgment). Justice Sotomayor recognized that advancements in technology and surveillance techniques will continue to affect and shape the evolution of societal privacy expectations. *Id.* at 415. In determining society's ever-evolving reasonable expectations of privacy, Justice Sotomayor remarked,

> Awareness that the government may be watching chills associational and expressive freedoms. And the government's unrestrained power to assemble data that reveal private aspects of identity is susceptible to abuse. The net result is that GPS monitoring – by making available at a relatively low cost such a substantial quantum of intimate information about any person whom the government, in its unfettered discretion, chooses to track – may alter the relationship between citizen and government in a way that is inimical to democratic society.

*Id.* at 416 (citation and quotation marks omitted) (asking, "whether people reasonably expect that their movements will be recorded and aggregated in a manner that enables the government to ascertain, more or less at will, their political and religious beliefs, sexual habits, and so on"). Justice Alito further recognized that an average person's expectations about the privacy of his or her daily movements does not include instances, for example, where "[o]n toll roads, automatic toll collection systems create a precise record of the

movements of motorists who choose to make use of that convenience." *Id.* at 428 (Alito, J. concurring).[9] Justice Alito cautioned, however, that "society's expectation has been that law enforcement agents and others would not – and indeed, in the main, simply could not – **secretly monitor and catalogue every single movement of an individual's car for a very long period**."[10] *Id.* at 430 (emphasis added).

Several years later, in 2018, the United States Supreme Court, in *Carpenter*, *supra*, was asked to decide "whether the [g]overnment conducts a search under the Fourth Amendment when it accesses historical [cellular telephone] records that provide a comprehensive chronicle of the user's past movements." *Carpenter*, 138 S.Ct. at 2211. At the outset, the Justices recognized that the basic purpose of the Fourth Amendment was "to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Id.* at 2213. The High Court further noted that "a

_____

[9] Justices Ginsburg, Breyer, and Kagan joined Justice Alito's opinion concurring in the judgment of the High Court.

[10] The United States Court of Appeals for the District of Columbia aptly illustrated the notion that prolonged surveillance of an individual's vehicular movements reveals more about that individual than does any single view with the following example – "a single trip to a gynecologist's office tells little about a woman, but that trip followed a few weeks later by a visit to a baby supply store tells a different story." *United States v. Maynard*, 615 F.3d 544, 562 (D.C. Cir. 2010); *see also Riley v. California*, 573 U.S. 373, 394 (2014) (stating, "[t]he sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two").

central aim of the Framers [of the Fourth Amendment] was to place obstacles in the way of a too permeating police surveillance." *Id.* at 2214 (citation and original quotation marks omitted). The ***Carpenter*** Court held that "an individual maintains a legitimate expectation of privacy in the record of his[, or her,] movement as captured through [cell-site location information ("CSLI")]." *Id.* at 2217. The High Court reasoned that,

> Allowing government access to cell-site records contravenes that expectation [of privacy that an individual reasonably has in the whole of his or her physical movements]. Although such records are generated for commercial purposes, that distinction does not negate Carpenter's anticipation of privacy in his physical location. Mapping a cell[ular tele]phone's location over the course of 127 days provides an all-encompassing record of the holder's whereabouts. As with GPS information, **the time-stamped data provides an intimate window into a person's life**, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations. These location records hold for many Americans the privacies of life. And like GPS monitoring, cell[ular tele]phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools. With just the click of a button, the [g]overnment can access each carrier's deep repository of historical location information at practically no expense.

*Id.* at 2217-2218 (citations and original quotation marks omitted; emphasis added). Because Carpenter maintained a reasonable expectation of privacy in the record of his movements as captured through historical CSLI data, the "location information obtained from Carpenter's wireless carrier was the

product of a search" and was, therefore, protected under the Fourth Amendment.[11] *Id.* at 2217.

Recently, our Supreme Court, in ***Commonwealth v. Pacheco***, 263 A.3d 626 (Pa. 2021), addressed the question left unresolved by the United

---

[11] The ***Carpenter*** Court further held that the fact that the historical CSLI data was held by, and obtained from, a third-party, *i.e.*, a wireless carrier, did not overcome the claims of Fourth Amendment protection of this location information. ***Carpenter***, 138 S.Ct. at 2220.

Citing ***Knotts***, the Commonwealth, in the case *sub judice*, argues that Appellant has no reasonable expectation of privacy in his movements from one place to another. Commonwealth's Brief at 16. In developing this contention, the Commonwealth argues that the LPR system here "provides a single image, at a single point in time, of [Appellant's] license plate while it is on a public throughfare." ***Id***. at 15. As such, the LPR system does not furnish "near-perfect surveillance" that comprehensively targets an individual's network of social, professional, political, and other relationships and associations. ***Id***.

I respectfully disagree with this view. My study of the relevant decisions issued by the United States Supreme Court, from ***Knotts***, *supra*, to ***Carpenter***, *supra*, reveals a compelling trend with direct implications to the issues now before us. In ***Knotts***, the High Court held that augmentation of sensory faculties did not alter the basic assumption that an individual did not possess an expectation of privacy in his movements along public highways. ***Knotts***, 460 U.S. at 282. In ***Carpenter***, however, government access to a detailed compilation of locational records triggered a search of information to which a legitimate expectation of privacy extended. ***Carpenter***, 138 S.Ct. at 2217. If the police officers in the case *sub judice*, with or without augmentation, observed Appellant's vehicle on a highway, their observations would not intrude upon Appellant's legitimate expectation of privacy. In contrast, police access to LPR data compilations entails access to detailed records of vehicular travel spanning significant time periods. Because this access offered the police a comprehensive data set charting the movements of Appellant and his vehicle, I conclude that the weight of constitutional authority augers in favor of recognizing a search for purposes of the Fourth Amendment.

States Supreme Court in *Carpenter* - namely whether Fourth Amendment protections extend to the collection of real-time CSLI.[12] *Pacheco*, 263 A.3d at 638-639. In affirming the decision of this Court, our Supreme Court held in *Pacheco* that "*Carpenter*'s warrant requirement for the collection of historical CSLI, which provides a comprehensive chronicle of the user's past movements, applies with equal force to the collection of real-time CSLI[.]" *Id.* at 640 (citation and original quotation marks omitted); *see also Pacheco*, 227 A.3d at 370 (holding that, "an individual maintains a legitimate expectation of privacy in the record of his[, or her,] physical movements as captured through real-time CSLI"). Our Supreme Court reasoned that, *inter alia*, Pacheco maintained "an expectation of privacy in his location and physical movements as revealed by the Commonwealth's collection of real-time CSLI over a period of months, which society is prepared to accept as reasonable[.]" *Pacheco*, 263 A.3d at 640. The *Pacheco* Court explained,

> the continual real-time CSLI provided an intimate window into [Pacheco's] personal endeavors, revealing a wealth of information about his patterns of activity, associations with other individuals, and the privacies of his daily life. As the facts presented demonstrate, real-time [cellular tele]phone-location tracking affords law enforcement an investigative tool that did not exist before the cell[ular tele]phone age, *i.e.*, the power to determine [Pacheco's] precise location and follow him continuously without detection, achieving near perfect surveillance of his location over the course of a lengthy criminal investigation as occurred here.

---

[12] The *Carpenter* Court limited its holding, stating that, "We do not express a view on matters not before us: real-time CSLI or "tower dumps" (a download of information on all the devices that connected to a particular cell site during a particular interval)." *Carpenter*, 138 S.Ct. at 2220.

This state action provided a comprehensive chronicle of [Pacheco's] physical movements to the same extent found in ***Carpenter***, which intruded upon his reasonable expectation of privacy. Indeed, it is unreasonable for society to expect that law enforcement may secretly manipulate our cell[ular tele]phones to compel the device to reveal our physical movements over a period of time.

***Id.*** at 640-641.

With this historical perspective in mind, I turn to the instant case. At the suppression hearing, Officer Bielecki testified that the "majority of the patrol vehicles" operated by the Bensalem Township Police Department were equipped with LPRs located on top of the vehicles and that he was aware of at least one stationary LPR located near the Bensalem Township high school.[13] N.T., 8/4/21, at 16, 18. Officer Bielecki stated that LPRs are used to capture images of every vehicle license plate that comes within the LPR camera lens, and the images are compiled and stored in a secure database maintained by, in this case, Vigilant, a third-party technology vendor. ***Id.*** at 17, 19, 22. The LPR system, Officer Bielecki explained, provides a user, such as a police officer, with a searchable database containing the date, time, and location of each license plate image after its LPR capture. ***Id.*** at 20-23. Officer Bielecki further explained that the LPR system showed not only license plate information that was captured in Bensalem Township but also showed license

_____

[13] Officer Bielecki further explained that even if a police officer did not operate a police vehicle with a LPR attached to the vehicle, a police officer still had access to the license plate data. N.T., 8/4/21, at 19. In order to access the LPR system, a police officer needed only to gain access to the surveillance network *via* login credentials. ***Id.*** at 19-20.

plate information that was captured elsewhere, provided that the LPR device capturing the license plate image downloaded the image to the same database system, such as the Vigilant data system. *Id.* at 46 (stating, "I [Officer Bielecki] can go back over X amount of time and [the LPR system] will [report] all the times [a vehicle bearing a certain license plate number] passed any LPR[s] that were in Bensalem [Township], or if [the LPRs] were in Camden, [New Jersey,] or if they were in Newark,[ New Jersey,] or if there's [a] LPR that's through the [V]igilant system in another township, county, whatever"). Officer Bielecki testified that the LPR system could not pinpoint a vehicle's exact location at a given moment in time, but was able to show a historical compilation of past travel, as well as the most recent location of the vehicle based upon a just-captured image of the license plate by a LPR. *Id.* at 46. In other words, the LPR system provides a compilation of the historical movements of a vehicle and provides a police officer a place to start looking to locate a vehicle once the license plate has been captured by the LPR in real-time.

Relative to Appellant, Officer Bielecki testified that at some point several months prior to June 17, 2020, he received information from the Philadelphia Police Department that "a man with dreadlocks" had been involved in two narcotics transactions while driving the vehicle that was subsequently involved

in the June 17, 2020 traffic stop as described *supra*.[14]  ***Id.*** at 15-16.  The Philadelphia Police Department provided Officer Bielecki with the license plate number of the vehicle, and Officer Bielecki entered that license plate number into the LPR system that was maintained by Vigilant and used by the Bensalem Township Police Department.  ***Id.*** at 16, 19.  Upon entering the license plate number into the LPR system, Office Bielecki stated he was able to review information showing that, historically, Appellant's vehicle traveled northbound and southbound on the roadway located near the Bensalem Township high school "numerous times over a time period."  ***Id.*** at 16-17.  Officer Bielecki configured the LPR system to send him an alert *via* email **every time** Appellant's license plate was read by a LPR regardless of whether the image was captured in Bensalem Township or elsewhere.[15]  ***Id.*** at 25.

On June 17, 2020, Officer Bielecki received an alert *via* email that Appellant's vehicle was headed southbound on a public roadway located in

---

[14] The affidavit of probable cause attached to the application to obtain a search warrant for Appellant's vehicle states that the two instances in which Appellant's car was involved in a narcotics transaction occurred on April 22, 2020.  **See** Application for Search Warrant, 6/18/20, at Affidavit of Probable Cause.

[15] Officers Bielecki and Mathew indicated that in the time period between April 22, 2020, and June 17, 2020, an image of Appellant's license plate had been captured **over 50 times** by LPRs.  **See** Application for Search Warrant, 6/18/20, at Affidavit of Probable Cause.

Bensalem Township.[16]  *Id.*  At that time, Officer Bielecki, and two fellow-police officers, one of whom was Officer Mathew, were conducting an unrelated undercover investigation at an apartment complex located just south of the location where the LPR captured an image of Appellant's license plate on June 17, 2020.  *Id.*  The police officers left their undercover investigation and located Appellant's vehicle using the information provided in the LPR system alert.[17]  *Id.* (stating, "I [Officer Bielecki] said to Officer Mathew if we could [maybe] go up and see if we can see where the vehicle is and [maybe] follow it").  The police officers' purpose in locating the vehicle was to follow the vehicle in the hope of observing Appellant conducting a drug transaction while using the vehicle in Bensalem Township.  *Id.* at 26, 28, and 49 (stating, "we were trying to figure out and corroborate the information we had received" from the Philadelphia Police Department regarding Appellant's use of the vehicle while conducting narcotics transactions); *see also* N.T., 8/5/21, at 34. While traveling northbound in their undercover police vehicle, the police officers drove past Appellant's vehicle, which was traveling southbound on the

---

[16] The email alert indicated that an image of the license plate was just captured by the stationary LPR located near the Bensalem Township high school.  N.T., 8/4/21, at 25.

[17] To be clear, the information provided in the alert notified Officers Bielecki and Mathew that Appellant's vehicle was being driven southbound on a certain roadway in Bensalem Township.  The police officers used this information in order to curtail the area to a certain roadway, in a certain section of Bensalem Township to begin searching for Appellant's vehicle, thereby increasing the likelihood of locating Appellant's vehicle.

same roadway. N.T., 8/4/21, at 28. Officer Mathew maneuvered the undercover police vehicle so that it was then traveling southbound on the same roadway, and in the same direction, as Appellant's vehicle. *Id.* Officer Bielecki stated that, at the time Officer Mathew made a U-turn of the undercover police vehicle, Officer Bielecki did not observe Appellant's vehicle "swerving in the lane" of traffic or committing a violation of the Vehicle Code. *Id.* at 51. While following directly behind Appellant's vehicle, however, Officer Bielecki and Officer Mathew observed the vehicle leave its lane of travel several times. *Id.* at 30; *see also* N.T., 8/5/21, at 15-16. Based upon these observations, Officer Bielecki and Officer Mathew initiated a traffic stop of Appellant's vehicle. N.T., 8/4/21, at 33. As a result of this traffic stop and based upon suspicion of marijuana use by the vehicle's occupants, Appellant was asked to exit the vehicle. *Id.* at 35-41. Appellant refused to exit the vehicle and was forcibly removed by several police officers. *Id.* at 41; *see also* N.T., 8/5/21, at 22-25.

After removing Appellant from the vehicle, Officer Mathew testified that a decision was made to obtain a search warrant for the vehicle and, as such, the vehicle had to be towed to a secure lot until such time as a search warrant could be obtained because leaving the vehicle in its current location presented a safety hazard. N.T., 8/5/21, at 25, 33. Prior to towing, Officer Mathew stated that, pursuant to Bensalem Township Police Department policy, an inventory search of the vehicle was conducted in order to, *inter alia*, catalog any valuables left in the vehicle and note any damage to the vehicle. *Id.* at

27. The inventory search of the vehicle revealed the following items: (1) a female handbag located in the front passenger seat; (2) money located in the center console; (3) Appellant's wallet located in a compartment on the driver's side front door; (4) keys for the vehicle; and (5) a backpack located in the center of the rear passenger seat, which when opened by Officer Mathew revealed a ziplock bag of what appeared to be narcotics. *Id.* at 28-30.

To reiterate, the question we are asked to resolve in the case *sub judice* is whether Officer Bielecki's use of the LPR system data to monitor, track, and locate Appellant's vehicle constituted a "search" for purposes of the Fourth Amendment. Given the comprehensive nature of the LPR information, which includes capturing and cataloging the movements of an individual's vehicle by virtue of LPR image capture and compilation of that information (*i.e.*, the date, time, and GPS location when the license plate image was captured) for a seemingly indefinite period of time, I find that Appellant maintained an expectation of privacy in the whole of his movements as captured and digitally profiled by the LPR system. Thus, when Officer Bielecki accessed Appellant's historical LPR data for the purpose of reviewing and monitoring Appellant's movements and when Officer Bielecki activated the LPR system's alert capabilities to aid in tracking and locating Appellant at any given point in time, Officer Bielecki conducted a "search" for purposes of the Fourth Amendment. To be clear, I do not hold that capturing, cataloging, and storing license plate information constitutes a search for purposes of the Fourth Amendment. An individual does not maintain an expectation of privacy in each license plate

image captured by a LPR, or the compilation thereof. *See Class*, 475 U.S. at 114. Rather, it is the unfettered access to historical location data and the receipt of alerts for obtaining actionable intelligence and monitoring an individual's movements over a period of time that triggers a search within the contemplation of the Fourth Amendment. *See Carpenter*, *supra*; *see also Pacheco*, *supra*. Stated differently, the compilation and storage of license plate images in a database, such as the one maintained by Vigilant, does not give rise to Fourth Amendment protections because an individual does not maintain an expectation of privacy in his or her license plate, which is visible to the public and subject to compulsory display on a vehicle pursuant to the Vehicle Code. Rather, the "search" for purposes of Fourth Amendment protection occurs when law enforcement personnel, such as Officer Bielecki, access the LPR system for the purpose of reviewing and monitoring an individual's movements or configures the system to issue alerts each time a particular license plate image is captured by a LPR.

This historical LPR data, *i.e.*, the stored license plate images depicting the date, time, and GPS location of each image capture, is analogous to the historical CSLI that the United States Supreme Court in *Carpenter*, *supra*, held was protected by the Fourth Amendment. Likewise, the real-time information provided by a LPR system alert each time an image of a particular license plate is captured by a LPR is analogous to the real-time CSLI that our Supreme Court in *Pacheco*, *supra*, held was protected by the Fourth

Amendment.[18] Similar to the use of CSLI to chronicle the past movements of Carpenter or the real-time movements of Pacheco, Officer Bielecki in the case *sub judice*, used the historical LPR data (showing that Appellant regularly traveled the roadway near the Bensalem Township high school) to chronicle Appellant's movements over a period of several months and arranged to receive real-time alerts (having received more than 50 alerts of Appellant's license plate captured by a LPR between April 22, 2020, and June 17, 2020)

_____

[18] Justice Wecht, in his concurring and dissenting opinion in **Dunkins**, remarked that,

> the linchpin of **Carpenter** was that, because of the inseparable relationship between a person and his[, or her,] cell[ular tele]phone, it is not objectively reasonable to expect that a cell[ular tele]phone user can avoid the creation of the records as he or she travels through the public sphere. Because the user has no reasonable way to limit the creation of the records, and because of the extensive information compiled by those records, the [High] Court found that a reasonable expectation of privacy existed. The inverse must also be true: if a person can limit the creation of the records, or if the device or instrumentality at issue is not so inextricably and unavoidably attached to modern life, no such expectation of privacy would prevail.

**Dunkins**, 263 A.3d at 269.

Similar to modern-day cellular telephone use, individuals constantly utilize and rely on their personal vehicles driven on public thoroughfares to carry-out their daily life events, *i.e.*, driving to work, taking the children to school, attending a house of worship, or the mundane task of going to the grocery store. With the increasing number of LPRs appearing on telephone poles, traffic light structures, and highway signs, a driver cannot escape having an image of his or her license plate captured numerous times in a single driving excursion. A driver has no ability to "opt-out" of the LPR technology as means of limiting the record of his or her travels. As such, the compilation of these images is akin to CSLI.

- 30 -

that, ultimately, enabled Officers Bielecki and Mathew to locate Appellant on June 17, 2020. *Carpenter*, 138 S.Ct. at 2217 (recognizing that, "individuals have a reasonable expectation of privacy in the **whole** of their physical movements" (emphasis added)); *see also Pacheco*, 263 A.3d at 652 (holding that, "because [Pacheco] had a legitimate expectation of privacy in his continuous real-time CSLI, the *Carpenter* rationale requiring a warrant for the collection of historical CSLI applies with equal force here"). Mapping a vehicle's location over the course of several months, through historical LPR data and real-time LPR alert data, provides an all-encompassing record of the vehicle's whereabouts and an intimate window into a driver's life, revealing not only his or her particular movements in the vehicle but, moreover, a picture of his or her "familial, political, professional, religious, and sexual associations" that the Fourth Amendment is designed to protect. *See Carpenter*, 138 S.Ct. at 2217. Because Appellant maintained an expectation of privacy in the whole of his movements that society would recognize as reasonable, access to his historical LPR data and tagging his vehicle for future alerts and image captures constituted a search for purposes of the Fourth Amendment. To be clear, the "search" for purpose of the Fourth Amendment occurred when Officer Bielecki (1) accessed the LPR system to review the historical movement of Appellant's vehicle, (2) arranged to receive alerts each time an image of Appellant's license plate was captured going forward, and (3) received such an alert each time thereafter. It was the information gained from the LPR system that, ultimately, enabled Officers Bielecki and Mathew to

locate Appellant's vehicle on June 17, 2020, and follow that vehicle until they observed Appellant commit the aforementioned traffic violation. But for Officer Bielecki's access to the LPR system and his receipt of alerts, he and Officer Mathew would not have been driving behind Appellant's vehicle on June 17, 2020, observing the traffic violation that led to the traffic stop.[19] Thus, Officer Bielecki was required to first obtain a warrant before accessing this historical LPR data and arranging to receive alerts under the circumstances of the case *sub judice*. **See Knotts**, 460 U.S. at 282 (stating, "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not a [police officer]"). Because Office Bielecki did not obtain a warrant, accessing Appellant's historical LPR data and arranging to receive alerts, which chronicled the whole of Appellant's movements over the course of several months, was (in my view) illegal. Consequently, the physical evidence obtained as a result of this illegal search should have been suppressed as "fruit of the poisonous tree."[20] Therefore, I

---

[19] My position is not intended to place a chilling effect on use of LPR technology as an aid to police investigation. For example, law enforcement, with the knowledge of a particular license plate number that is of interest in an investigation, such as Appellant's license plate in the case *sub judice*, may capture the image of that license plate *via* a LPR located in the police officer's patrol vehicle and decide to follow the vehicle-of-interest for observation purposes. In this instance, the use of LPR technology simply augments the sensory faculties of the police officer (*i.e.*, visual observation). **See Knotts**, 460 U.S. at 282.

[20] The "fruit of the poisonous tree" doctrine renders inadmissible evidence that was derived from a search or seizure conducted in violation of the Fourth

would conclude that the trial court erred when it denied Appellant's *omnibus* motion to suppress such physical evidence based upon its conclusion that no search occurred in contravention of the Fourth Amendment of the United States Constitution.[21]   As such, I would vacate Appellant's judgment of

_____

Amendment.  ***Commonwealth v. Santiago***, 209 A.3d 912, 916 n.4 (Pa. 2019).

In the case *sub judice*, absent Officer Bielecki's illegal search of Appellant's historical LPR data, which included receiving alerts every time the license plate was captured by a LPR, the police officers would not have known where Appellant was operating his vehicle on June 17, 2020.  As such, they would not have observed Appellant committing traffic violations, performed a traffic stop, and obtained the physical evidence that flowed from this traffic stop.

[21] Although this Court is not bound by the decisions of federal district courts, I am cognizant that the decision rendered by a United States District Court for the Western District of Pennsylvania in ***Bowers***, ***supra***, would be contrary to my approach to the issues raised herein.  In ***Bowers***, the United States District Court reasoned that LPR technology was more akin to security cameras rather than the "all-pervasive" CSLI in ***Carpenter***.  ***Bowers***, 2021 WL 4775977, at *3.  Because the LPR data did not provide a "near-perfect surveillance" of the vehicle, the ***Bowers*** Court reasoned, the collection of this data did not implicate the privacy concerns raised by ***Carpenter***.  ***Bowers***, 2021 WL 4775977, at *3-*4.  I disagree.

The ***Carpenter*** Court held that an individual maintained an expectation of privacy, which society accepts as reasonable, **in the whole of the person's movements**.  While I agree that the GPS technology used by cellular devices provides a more-exact location of the cellular device, historical LPR data and the real-time information provided in subsequent system alerts nonetheless provide a similar chronicle of an individual's movements given that the data can be collected by any LPR device across the globe provided that the data is then downloaded to a common technology company such as Vigilant.  This data allows the government, such as a law enforcement officer, to monitor, with unfettered discretion, when an individual drives his or her vehicle from this location to that location, from this city to that city, or from this state to that state without law enforcement having to employ "old-time" (*i.e.*, less

sentence and reverse the trial court order denying Appellant's *omnibus*

motion.[22]

_____

technologically savvy) surveillance methods. Moreover, this LPR technology allows an individual with access to the data, such as Officer Bielecki, to receive almost instant notification of the individual's movements based upon the capture of the vehicle's license plate by a LPR. This form of monitoring and tracking of an individual's movements over a period of time by law enforcement strikes me as the precise type of privacy invasion forbidden by the **Carpenter** Court, the **Pacheco** Court, and the Fourth Amendment. Moreover, LPR technology, because of its searchable attributes and email alert network, is far more sophisticated and intrusive than a security camera. Finally, I disagree with the **Bowers** Court that viewing 106 captures of a individual's license plate "in thirty-three unique public locations over a four-and-a-half-month period" was "a limited data collection." **See Bowers**, 2021 WL 4775977, at *4.

I similarly find the Majority's reliance on **United States v. Graham**, 2022 WL 4132488 (D. N.J. filed Sept. 12, 2022) (slip copy) to be misplaced. **See** Majority at *11-*12. Although the United States District Court for New Jersey found that Graham "failed to meet his burden to show that he [had] a reasonable expectation of privacy in his location and physical movement as captured through [the LPR device,]" the court did so because "law enforcement's use of [the LPR] database [was] limited to **a single occurrence on a single day**[.]" **Graham**, 2022 WL 4132488, at *5.

In the case *sub judice*, Officer Bielecki's use of the LPR database involved more than viewing a single capture of Appellant's license plate on a single day. Rather, Officer Bielecki reviewed a compilation of Appellant's historical data to analyze his driving patterns and programmed the system to send him alerts containing real-time location information – a far cry from a "limited single occurrence on a single day."

[22] In light of my dissent, I would find it unnecessary to address Appellant's second issue.